In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-2406

JOHN F. TAMBURO doing business as
MAN'S BEST FRIEND SOFTWARE and
VERSITY CORPORATION,

*Plaintiffs-Appellants,*

*v.*

STEVEN DWORKIN, KRISTEN HENRY,
ROXANNE HAYES, KAREN MILLS, and
WILD SYSTEMS PTY LTD.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 3317—**Joan B. Gottschall**, *Judge.*

ARGUED FEBRUARY 26, 2009—DECIDED APRIL 8, 2010

Before BAUER, KANNE, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* John Tamburo, an Illinois resident
who operates a dog-breeding software business in Illinois,
filed suit in the Northern District of Illinois alleging
federal and state antitrust violations and several inten-

tional tort claims under Illinois law. His claims arise out of a dispute over the contents of a dog-pedigree software program he developed by lifting data from the defendants' websites. He alleges the defendants used the Internet to retaliate against him for copying their online data, which he contends was in the public domain. The defendants are a Canadian proprietor of a dog-pedigree website who has never visited or transacted business in Illinois; three Americans who likewise maintain dog-pedigree websites and are residents of Colorado, Michigan, and Ohio with only sporadic contacts with Illinois; and an Australian software company with insignificant sales in Illinois. This appeal requires us to apply long-established rules for asserting personal jurisdiction over foreign defendants to the relatively new setting of torts committed over the Internet.

Tamburo alleges that the individual Canadian and American defendants engaged in a concerted campaign of blast emails and postings on their websites accusing him of stealing their data and urging dog enthusiasts to boycott his products. He also claims they sent some of these messages to the owner of the Australian company, who reposted them to a private dog-breeder listserve. These emails and Internet postings, Tamburo claims, violate federal and state antitrust laws, were defamatory and tortiously interfered with his software business, and constituted a civil conspiracy to boot. The defendants moved to dismiss for lack of personal jurisdiction and alternatively for failure to state a claim. The district court dismissed the case against all defendants for lack of personal jurisdiction.

We affirm in part and reverse in part. First, Tamburo's federal and state antitrust allegations are woefully inadequate under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); we affirm the dismissal of those claims on the alternative basis that they fail to state a claim. Without a viable federal claim, personal jurisdiction is determined under Illinois' long-arm statute, which authorizes jurisdiction to the full extent permitted by the United States Constitution. 735 ILL. COMP. STAT. 5/2-209(c). General personal jurisdiction is lacking here; none of the defendants has continuous and systematic contacts with Illinois.

Applying *Calder v. Jones*, 465 U.S. 783 (1984), we conclude that specific personal jurisdiction lies in Illinois over the individual Canadian and American defendants on Tamburo's intentional tort claims. These defendants are alleged to have used their websites—or in the case of the Canadian defendant, blast emails to the online dog-pedigree community—to defame and tortiously generate a consumer boycott against Tamburo, knowing that he lived and operated his software business in Illinois and would be injured there. Indeed, some of the messages specifically listed Tamburo's Illinois address and urged readers to harass him. This is enough for a prima facie case of personal jurisdiction under *Calder*'s "express aiming" test for personal jurisdiction in intentional-tort cases. The case for personal jurisdiction over the Australian company is much weaker. Tamburo alleged only that the owner of the company received messages from the other defendants and reposted them on a private listserve. There is no allegation that he disseminated the messages more broadly or that he knew that Tamburo operated his business in Illinois. Accordingly, Tamburo's allega-

tions are insufficient to establish a prima facie case for specific personal jurisdiction over the Australian company.

## I.  Background[1]

John Tamburo, doing business as Man's Best Friend Software, lives and operates his business in Illinois. He designs software for use by dog breeders and noncommercial dog enthusiasts.[2] One of his products, an online database called The Breeder's Standard, provides customers with access to dog-pedigree information. To create the database, Tamburo developed an automated computer program that scanned the Internet for information about dog pedigrees. He then incorporated the data he retrieved into The Breeder's Standard.

Defendants Kristen Henry, Roxanne Hayes, Karen Mills, and Steven Dworkin are proprietors of public websites that provide free access to dog-pedigree information. Henry, a Colorado citizen and resident, also breeds and shows dogs. Hayes, a Michigan citizen and resident, raises,

---

[1] Because this case comes to us from a jurisdictional dismissal on the pleadings, we take the factual background from the Sixth Amended Complaint, and where not contradictory, from affidavits submitted by the parties in connection with their motion to dismiss.

[2] Tamburo was also the president and sole shareholder of Versity Corporation, the other plaintiff in this suit. Versity dissolved in May 2004 just before this lawsuit was filed and appears as a plaintiff by virtue of 805 ILL. COMP. STAT. 5/12.80, the Illinois statute authorizing postdissolution survival of actions.

shows, and "places" dogs but does not commercially breed them. Mills, a citizen and resident of Ohio, raises and shows dogs. Dworkin, a Canadian citizen who resides in Ottowa, also raises and shows dogs.[3]

Tamburo pulled much of the information included in The Breeder's Standard from the websites operated by Henry, Hayes, Mills, and Dworkin. In retaliation Henry, Hayes, and Mills posted statements on their websites accusing Tamburo of "theft," "hacking," and "selling stolen goods," and calling on readers to boycott his products. They also posted Tamburo's Illinois address on their websites and urged readers to contact him to harass him and otherwise complain. Dworkin retaliated in a different way. First, he emailed Tamburo and demanded that he remove the "blatent [sic] theft of data" from The Breeder's Standard "within 5 days." If Tamburo failed to do so, Dworkin threatened to "publish to each and every dog[-]based list the sleazy methods" of Tamburo's operation. When Tamburo did not comply, Dworkin emailed "all persons who had a free online database of dog pedigrees on the Internet" saying that Tamburo's product contained pedigree data that was "stolen," "mined," and "harvested" for improper "commercial use," and suggested that all proprietors of online dog-pedigree databases "band together to stop this theft" of their data.

The fifth defendant is Wild Systems Pty Ltd., an Australian software company that offers a pedigree software program called Breedmate. Wild Systems also runs a

---

[3] Dworkin died during the pendency of this appeal; defendants' counsel represents his estate.

private online Yahoo! email listserve for customers who have purchased the Breedmate software. Ronald DeJong, the owner and president of Wild Systems, manages this email list and must approve any message sent to it. The individual defendants sent DeJong messages for posting on the Breedmate listserve; these messages, like the others, protested that Tamburo had stolen their data. DeJong in turn transmitted these messages to the Breedmate listserve. Later, DeJong and the individual defendants organized a closed Internet chat group—called the "APDUG Group"[4]—for users of Alfirin software, a product used to manage dog-pedigree databases. In messages posted to the APDUG Group, the individual defendants again accused Tamburo of "theft," "selling stolen goods," and "hacking."

Tamburo sued the five defendants in the Northern District of Illinois, seeking a declaratory judgment that he did not violate any federal law by incorporating the defendants' databases into his software. He also sought damages for federal and state antitrust violations and asserted claims for defamation, tortious interference with existing contracts and prospective economic advantage, trade libel, and civil conspiracy under Illinois law.[5]

The defendants moved to dismiss the complaint for lack of personal jurisdiction and failure to state a claim.

---

[4] "APDUG" stands for Alfirin Pedigree Database Users Group.

[5] Tamburo estimates he lost over $525,000 in sales as a result of the defendants' conduct.

*See* FED. R. CIV. P. 12(b)(2), 12(b)(6). The district court concluded that personal jurisdiction was lacking as to all defendants and dismissed the case without considering the alternative failure-to-state-a-claim arguments. Tamburo moved for reconsideration, asking the court to transfer the case to the Western District of Michigan. This motion was denied and Tamburo appealed.

## II. Discussion

### A. Antitrust Claims

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court clarified the pleading requirements for antitrust claims: "[A] formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555-56 (citations and all caps omitted). "Because § 1 of the Sherman Act does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy, . . . [t]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express . . . ." *Id.* at 553 (internal quotation marks and citations omitted) (alterations in original). Accordingly, a complaint alleging an antitrust claim must contain "enough factual matter (taken as true) to suggest that an agreement was made.*" Id.* at 556. In addition, depending on the nature of the claim, the complaint must plausibly plead the existence of an antitrust injury; this requires factual allegations suggesting that the "claimed injuries are of the type the

antitrust laws were intended to prevent and reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation." *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 716 (7th Cir. 2006) (internal quotation marks omitted).

Tamburo's antitrust claims are pleaded in a wholly conclusory fashion; as such, it is hard to tell what kind of antitrust violation he is trying to assert. The complaint contains no factual allegations suggesting the existence of an antitrust conspiracy or an antitrust injury. The federal claim alleges only that the defendants possessed "monopoly power in the relevant market of dog breeding data," which they acquired "by means of anticompetitive and/or predatory conduct," and that this "violated provisions of Federal Antitrust statutes including 15 U.S.C. [§§] 1, *et seq*." This appears to sweep in the entire gamut of federal antitrust violations, but there are no allegations whatsoever regarding an antitrust injury. The complaint alleges only that Tamburo "has been damaged" as a result of "the wrongful acts of Defendants." This manner of pleading a federal antitrust claim is plainly improper under *Twombly*.

Tamburo's attempt to plead a state-law antitrust violation fares no better. The complaint asserts a claim under the Illinois Antitrust Act, 740 ILL. COMP. STAT. 10/1 *et seq.*, which parallels the federal Sherman and Clayton Acts. But this section of the complaint simply repeats the inadequate allegations contained in the federal antitrust claim. Because federal pleading standards apply when we sit in diversity, *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir.

2008), Tamburo's state antitrust claim, like his federal one, fails to state a claim upon which relief can be granted. Accordingly, both claims were properly dismissed, though on Rule 12(b)(6) grounds rather than Rule 12(b)(2) grounds.

## B. Personal Jurisdiction

We review a dismissal for lack of personal jurisdiction de novo. *GCIU-Employer Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1023 (7th Cir. 2009). The plaintiff has the burden of establishing personal jurisdiction, and where, as here, the issue is raised by a motion to dismiss and decided on the basis of written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). At this stage, therefore, we take as true all well-pleaded facts alleged in the complaint and resolve any factual disputes in the affidavits in favor of the plaintiff. *Id.* ("In evaluating whether the prima facie standard has been satisfied, the plaintiff is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record." (internal quotation marks omitted)).

Where no federal statute authorizes nationwide service of process,[6] personal jurisdiction is governed by

---

[6] Tamburo argues that nationwide service of process was authorized pursuant to Rule 4(k)(1)(c) of the Federal Rules

(continued...)

the law of the forum state. FED. R. CIV. P. 4(k)(1)(A); *see also Citadel Group Ltd. v. Wash. Reg'l Med. Ctr.*, 536 F.3d 757, 760 (7th Cir. 2008). A court's exercise of personal jurisdiction may be limited by the applicable state statute or the federal Constitution; the Illinois long-arm statute permits the exercise of jurisdiction to the full extent permitted by the Fourteenth Amendment's Due Process Clause, 735 ILL. COMP. STAT. 5/2-209(c), so here the state statutory and federal constitutional inquiries merge. *See Citadel Group Ltd.*, 536 F.3d at 761. The key question is therefore whether the defendants have sufficient "minimum contacts" with Illinois such that the maintenance

---

[6] (...continued)

of Civil Procedure, together with § 22 of the Clayton Act, 15 U.S.C. § 22, or alternatively, under Rule 4(k)(2). Both jurisdictional bases, however, require a claim arising under federal law. Because Tamburo failed to adequately plead a federal antitrust claim, these jurisdictional options drop out of the case. We note for completeness that the circuits are divided over the proper interpretation of the venue and service-of-process language in § 22 of the Clayton Act. *See In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 293-97 (3d Cir. 2004) (describing the circuit split). This circuit has not yet addressed the matter, and because we are affirming the dismissal of the federal antitrust claim for failure to state a claim, we need not do so here. Moreover, as Tamburo's counsel properly conceded at oral argument, the presence of a claim under the Declaratory Judgment Act, 28 U.S.C. § 2201, does not supply a basis for acquiring personal jurisdiction over the defendants under Rule 4(k)(1)(C) or Rule 4(k)(2). *See Commercial Nat'l Bank of Chi. v. Demos*, 18 F.3d 485, 490 (7th Cir. 1994).

of the suit "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

Stated differently, each defendant must have purposely established minimum contacts with the forum state such that he or she "should reasonably anticipate being haled into court" there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quotation marks omitted). But jurisdiction cannot be avoided "merely because the defendant did not *physically* enter the forum State." *Id.* at 476. The Supreme Court has observed that "a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.* Still, we have said that "[p]otential defendants should have some control over—and certainly should not be surprised by—the jurisdictional consequences of their actions." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1278 (7th Cir. 1997). The Due Process Clause "gives some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen v, Woodson*, 444 U.S. 286, 297 (1980).

### 1. General Personal Jurisdiction

The nature of the defendant's contacts with the forum state determines the propriety of personal jurisdiction and also its scope—that is, whether jurisdiction is proper at all, and if so, whether it is general or specific to

the claims made in the case. A defendant with "continuous and systematic" contacts with a state is subject to general jurisdiction there in any action, even if the action is unrelated to those contacts. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984). The threshold for general jurisdiction is high; the contacts must be sufficiently extensive and pervasive to approximate physical presence. *Purdue Research Found.*, 338 F.3d at 787 & n.16. As such, isolated or sporadic contacts—such as occasional visits to the forum state—are insufficient for general jurisdiction. *Burger King*, 471 U.S. at 475. Nor is the maintenance of a public Internet website sufficient, without more, to establish general jurisdiction. *See Bird v. Parsons*, 289 F.3d 865, 874 (6th Cir. 2002).

Illinois cannot exercise general personal jurisdiction over any of the defendants in this case. Henry has been to Illinois only twice in ten years. Hayes has been to Illinois approximately 5 times and has placed 13 dogs with families in Illinois but did not receive any profits from these placements. She sold three copies of her book to individuals in Illinois through her website. Mills grew up in Illinois but moved away in 1979 and has only traveled back twice since then. Dworkin, the Canadian defendant, has never "been to, stopped in or passed through" Illinois. Each of the individual defendants maintains a public website obviously accessible by Illinois residents, but as we have noted, that is not enough to establish general personal jurisdiction. Finally, Wild Systems, the corporate defendant, is an Australian company located in New South Wales, Australia. It has no offices in Illinois (or anywhere in the United States, for that matter),

nor has it ever had a distributor in Illinois. Since it was incorporated in 1996, Wild Systems has had a total of $8,634 in sales to customers in Illinois. These sporadic contacts with Illinois do not approach the level of "continuous and systematic" contacts necessary to establish general personal jurisdiction.

### 2.  Specific Personal Jurisdiction

The question of specific personal jurisdiction is much more difficult. To support an exercise of specific personal jurisdiction, the defendant's contacts with the forum state must directly relate to the challenged conduct or transaction; we therefore evaluate specific personal jurisdiction by reference to the particular conduct underlying the claims made in the lawsuit. *See GCIU-Employer Ret. Fund*, 565 F.3d at 1024. Specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities. *Burger King*, 471 U.S. at 472. The exercise of specific personal jurisdiction must also comport with traditional notions of fair play and substantial justice as required by the Fourteenth Amendment's Due Process Clause. *Int'l Shoe*, 326 U.S. at 316. This case primarily concerns the question whether the defendants "purposefully directed" their conduct at the forum state.

### a. Conduct "purposefully directed" at the forum state

The purposeful-direction inquiry "can appear in different guises." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008). Personal jurisdiction in breach-of-contract actions often turns on whether the defendant "purposefully availed" himself of the privilege of conducting business or engaging in a transaction in the forum state. *See id.*; *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). But where, as here, the plaintiff's claims are for intentional torts, the inquiry focuses on whether the conduct underlying the claims was purposely directed at the forum state. *Dudnikov*, 514 F.3d at 1071; *see also Calder v. Jones*, 465 U.S. 783, 790 (1984). In all cases the point of the purposeful-direction requirement is to "ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state." *Dudnikov*, 514 F.3d at 1071 (quoting *Burger King*, 471 U.S. at 475).

The Supreme Court's decision in *Calder* provides some contours for the "purposeful direction" requirement in the context of a suit alleging intentional torts. *Calder* gave significant weight to the "effects" of a foreign defendant's conduct within the forum state. In *Calder* actress Shirley Jones—star of movie musicals and the 1970s television show *The Partridge Family*—filed suit in California against the *National Enquirer*, its local distributor, and the writer and editor of an allegedly libelous article that appeared in the *Enquirer*. 465 U.S. at 785-86. The *Enquirer* is a Florida corporation headquartered in Florida, and

the writer and editor were Florida residents; the individual defendants challenged personal jurisdiction in California. They argued that they were not responsible for the tabloid's distribution in California and had no economic stake in the publication's sales there, and the fact that they could foresee the article would be distributed and have an effect on Jones in California was not sufficient to confer personal jurisdiction. The Supreme Court disagreed, focusing on the effects of the article on its target in California: "[P]etitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California." *Id.* As the Court explained,

> Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devastating impact upon [Jones]. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the *National Enquirer* has its largest circulation. Under these circumstances, petitioners must reasonably anticipate being haled into court there to answer for the truth of the statements made in their article. An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause[d] the injury in California.

*Id.* at 789-90 (internal quotation marks and citations omitted).

*Calder* thus suggests three requirements for personal jurisdiction in this context: (1) intentional conduct (or

"intentional and allegedly tortious" conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state. *See Dudnikov*, 514 F.3d at 1072; *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265-66 (3d Cir. 1998). Extracting these requirements from *Calder* is reasonably straightforward; applying them in specific cases—especially cases like this one alleging tortious acts committed over the Internet—is more challenging.[7]

---

[7] The parties and the district court have approached the jurisdictional question in this case by reference to the specialized framework proposed in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997), for cases in which the challenged conduct occurs over the Internet. *Zippo* devised an alternative minimum-contacts test for Internet-based claims. As a general matter, the court in *Zippo* suggested that "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." *Id.* at 1124. More specifically, the court articulated a sliding-scale analysis that considers the degree of "interactivity" of a website to determine whether the electronic contacts with the forum are sufficient to satisfy *International Shoe*'s standard:

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defen-

(continued...)

⁷ (...continued)

>dant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

952 F. Supp. at 1124 (citations omitted).

Some circuits have followed *Zippo* when "electronic contacts" over the Internet are at issue. *See, e.g.*, *Revel v. Lidov*, 317 F.3d 467, 470 (5th Cir. 2002) ("This circuit has drawn upon the approach of *Zippo* . . . in determining whether the operation of an internet site can support minimum contacts necessary for the exercise of personal jurisdiction."); *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 713 (4th Cir. 2002) ("we adopt today the model developed in *Zippo*"); *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th Cir. 1997) (examining a website's level of interactivity in order to conduct the minimum-contacts analysis). We have not specifically done so, although we have considered a website's degree of interactivity in at least one personal-jurisdiction case. *See Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 549-50 (7th Cir. 2004). *Jennings* did not involve intentional-tort claims, however, and therefore has limited relevance here. As a more general matter, we hesitate to fashion a special jurisdictional test for Internet-based cases. *Calder* speaks directly to personal jurisdiction in

(continued...)

### 1. "Intentional" acts or "intentional *and* allegedly tortious" acts

The circuits are divided over whether *Calder'*s "express aiming" inquiry includes *all* jurisdictionally relevant intentional acts of the defendant or only those acts that are intentional *and* alleged to be tortious or otherwise wrongful. *Compare Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007) (focusing on defendant's intentional and allegedly tortious or wrongful acts), *with Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc) (considering all jurisdictionally relevant intentional acts); *see also Dudnikov*, 514 F.3d at 1072-73 (outlining this conflict). We need not take sides in this debate. Tamburo alleges that the individual defendants intentionally published defamatory statements on their websites or in blast emails. He further alleges that this conduct tortiously interfered with his business, constituted a trade libel, and that the defendants entered

---

[7] (...continued)

intentional-tort cases; the principles articulated there can be applied to cases involving tortious conduct committed over the Internet. *See Hy Cite Corp. v. Badbusinessbureau.com, L.L.C.*, 297 F. Supp. 2d 1154, 1161 (W.D. Wis. 2004) (declining to adopt *Zippo* as a substitute for the traditional minimum-contacts analysis); C. Douglas Floyd & Shima Baradaran-Robison, *Toward a Unified Test of Personal Jurisdiction in an Era of Widely Diffused Wrongs: The Relevance of Purpose and Effects*, 81 IND. L.J. 601, 657-58 (2006) (arguing that "a unique test of personal jurisdiction should not be adopted for cases involving wrongs committed by means of the Internet").

into a conspiracy to commit these wrongful acts against him. These are intentional-tort allegations, bringing this case squarely within the *Calder* formula even if the scope of the inquiry is more narrowly focused on the alleged tortious acts.

### 2. "Express aiming" and knowledge that plaintiff would be injured in forum state

In *Calder* the Supreme Court emphasized that the defendants were not "charged with mere untargeted negligence," but instead had "expressly aimed" their alleged libel at California, where they knew Jones lived and worked and would suffer the "brunt of th[e] injury." 465 U.S. at 789-90. As an analytical matter, *Calder*'s "express aiming" inquiry overlaps with the question whether the defendant knew the plaintiff would suffer the injury in the forum state, so we consider the two requirements together.

Some circuits have read *Calder*'s "express aiming" requirement fairly broadly, requiring only conduct that is "targeted at a plaintiff whom the defendant knows to be a resident of the forum state." *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000). Others have read it more narrowly to require that the forum state be the "focal point of the tort." *Dudnikov*, 514 F.3d at 1074 n.9; *see also IMO Indus., Inc.*, 155 F.3d at 263-65 ("the *Calder* 'effects test' can only be satisfied if the plaintiff can point to contacts which demonstrate that the defendant *expressly aimed* its tortious conduct at the

forum, and thereby made the forum the focal point of the tortious activity"); *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997) (conduct must be "intentionally targeted at and focused on" the forum state). Our circuit hasn't firmly settled on either of these understandings of *Calder*'s "express aiming" requirement. Indeed, two of our decisions—*Wallace v. Herron*, 778 F.2d 391 (7th Cir. 1985), and *Janmark, Inc. v. Reidy*, 132 F.3d 1200 (7th Cir. 1997)—are in some tension regarding the proper reading of *Calder*.

In *Wallace* the question was whether Indiana could exercise jurisdiction over California defendants who were sued by an Indiana resident for malicious prosecution when the allegedly tortious conduct occurred exclusively in California. Applying *Calder*, we held that jurisdiction was not proper in Indiana; in so holding we focused on the relationship between the defendants' actions and the forum state itself, not just on the relationship between those actions and the plaintiff's injury. 778 F.2d at 395 (noting that the defendants did not undertake any "action that created the necessary connection with Indiana"). We concluded that *Calder* did not alter the prevailing jurisdictional requirement that the defendant must engage in conduct that "create[s] a 'substantial connection' with the forum State." *Id.*

*Janmark* took a broader view of *Calder*. There, shopping-cart competitors Janmark and Dreamkeeper sold mini shopping carts throughout the United States—Dreamkeeper from California and Janmark from Illinois. 132 F.3d at 1202. Dreamkeeper accused Janmark of infringing its

copyright in a particular shopping-cart design, but Janmark refused Dreamkeeper's demand to stop manufacturing the carts. Dreamkeeper contacted a Janmark customer in New Jersey and threatened the customer with a contributory-infringement suit if it did not stop purchasing carts from Janmark. Janmark sued Dreamkeeper in Illinois on a variety of intentional-tort and intellectual-property theories, and we held that Illinois could exercise personal jurisdiction over Dreamkeeper. *Id.* Noting first that "the location of the injury . . . is vital to understanding where the tort occurred," we made this observation about *Calder*: "[T]here can be no serious doubt after *Calder* . . . that the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor." *Id.* We then concluded that "inducing the customers of an Illinois firm to drop their orders can be a tort in Illinois[,] and . . . whether or not it is a tort in Illinois, it is *actionable* in Illinois." *Id.* at 1203. In other words, jurisdiction was proper in *Janmark* because the defendant's express aim was to tortiously interfere with an Illinois company's sales and because the injury occurred in Illinois.

Another case—one specifically relied on in *Janmark*—is also instructive here. *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership*, 34 F.3d 410, 412 (7th Cir. 1994), involved a suit for copyright infringement by the National Football League's Indianapolis Colts against the Canadian Football League's Baltimore Colts—the latter team having been established after the NFL Colts moved from Baltimore to Indianapolis. We held that jurisdiction in Indiana was proper under *Calder*

because the Indianapolis team's injury occurred in that state and because the cable-television broadcasts of the Canadian team's games could be considered an "entry" into Indiana in the same sense that the *Enquirer*'s distribution of its tabloid was considered an "entry" into California in *Calder*. *Id.* We noted that in *Calder* and in other cases finding jurisdiction based on the *Calder* approach, "the defendant had done more than brought about an injury to an interest located in a particular state." *Id.*

*Janmark* is hard to reconcile with *Wallace* and to a lesser extent, with *Indianapolis Colts*—at least if *Janmark* is understood as broadly authorizing personal jurisdiction wherever a tort victim is injured.[8] Both *Wallace* and *Indianapolis Colts* read *Calder* to require a forum-state injury *and* "something more" directed at that state before jurisdiction over a foreign defendant may be considered proper. Importantly, however, the holding in *Janmark* ultimately focused on more than the fact that the injury had

---

[8] To the extent *Janmark* is understood to hold that jurisdiction is proper wherever the injury occurs, at least one of our sister circuits has questioned it. *See IMO Indus., Inc.*, 155 F.3d at 263-64 ("We believe [*Janmark*] interpreted *Calder* too broadly when it read that case to hold that the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor. . . . [S]uch a broad sweep fails to accommodate *Calder*'s emphasis on the fact that the forum must be the focal point of the harm and that the defendant must expressly aim the tortious activity at the forum." (internal quotation marks and citation omitted)).

occurred in Illinois; *Janmark*'s jurisdictional conclusion was premised on the Illinois-based injury *and* the fact that the defendant acted with the purpose of interfering with sales originating in Illinois. Thus, despite its broad language about *Calder*, *Janmark* ultimately considered the relationship between the allegedly tortious conduct and the forum state itself. *See Nerds on Call, Inc. (Indiana) v. Nerds on Call, Inc. (California)*, 598 F. Supp. 2d 913, 919 (S.D. Ind. 2008) (Hamilton, J.) ("In [*Janmark*], the injury was in Illinois, but Janmark was specifically targeted by a California company who induced a New Jersey party to break its contract with Janmark.").

This case involves both a forum-state injury *and* tortious conduct specifically directed at the forum, making the forum state the focal point of the tort—at least with respect to the individual defendants. (We will discuss the corporate defendant in a moment.) Moreover, if the cable-television broadcasts of Baltimore Colts football games could be considered an electronic "entry" into Indiana for purposes of personal jurisdiction in *Indianapolis Colts*, then the individual defendants' use of their public websites to defame an Illinois-based businessman and exhort readers to boycott his products can likewise be conceptualized as an electronic "entry" into Illinois for jurisdictional purposes.

More specifically, Dworkin, Henry, Hayes, and Mills are each alleged to have published false and defamatory statements about Tamburo, either on their public websites or in blast emails to other proprietors of online dog-pedigree databases. In some of these messages, readers

were encouraged to boycott Tamburo's products; in others, Tamburo's Illinois address was supplied and readers were urged to contact and harass him. The complaint also alleges that Dworkin personally contacted Tamburo by email, accusing him of "theft" and demanding that he remove the "stolen" data from The Breeder's Standard. Dworkin threatened to expose Tamburo's "theft" to the online dog-pedigree community if he did not comply. Dworkin, Henry, Hayes, and Mills engaged in this conduct with the knowledge that Tamburo lived in Illinois and operated his business there; their affidavits do not deny this. Thus, although they acted from points outside the forum state, these defendants specifically aimed their tortious conduct at Tamburo and his business in Illinois with the knowledge that he lived, worked, and would suffer the "brunt of the injury" there.[9] These allegations suffice to establish personal jurisdic-

---

[9] We note the circuits are also divided on the proper way to understand *Calder*'s emphasis on the defendant's knowledge of where the "brunt of the injury" would be suffered. *Compare Dudnikov*, 514 F.3d at 1072 (requiring the defendant to have "knowledge that the brunt of the injury would be felt in the forum state") *and IMO Indus., Inc.*, 155 F.3d at 265 (same), *with Yahoo!*, 433 F.3d at 1207 ("[T]he 'brunt' of the harm need not be suffered in the forum state. If a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state."). Again, we need not enter the fray; here, the whole of the injury was suffered in Illinois, and the individual defendants knew that would be the case. As we explain later, however, the same cannot be said of Wild Systems, the Australian corporate defendant.

tion over these defendants under either a broad *or* a more restrictive view of *Calder*.

The Tenth Circuit's decision in *Dudnikov* supports this conclusion. In *Dudnikov* a Connecticut-based company notified the online auction host eBay, based in California, that a line of prints featured in an eBay auction infringed its copyright. eBay responded by cancelling the auction for the prints. The online sellers of the prints lived and operated their business in Colorado; they filed a copyright suit in Colorado against the Connecticut-based company. The district court dismissed the case for lack of personal jurisdiction. 514 F.3d at 1068-69. In a comprehensive decision, the Tenth Circuit reversed. Although the Connecticut company's conduct originated outside of Colorado and was technically directed at eBay in California, its express goal was to halt sales of an online auction item originating in Colorado. This satisfied *Calder*'s "express aiming" requirement and was sufficient to establish personal jurisdiction over the Connecticut company in Colorado. *Id.* at 1075. The court offered the following analogy to help explain its decision:

> [The defendant's conduct] is something like a bank shot in basketball. A player who shoots the ball off of the backboard intends to hit the backboard, but he does so in the service of his further intention of putting the ball into the basket. Here, defendants intended to send the [copyright notice] to eBay in California, but they did so with the ultimate purpose of cancelling plaintiffs' auction in Colorado. Their "express aim" thus can be said to have reached into

Colorado in much the same way that a basketball player's express aim in shooting off of the backboard is not simply to hit the backboard, but to make a basket.

*Id.*

Although the circumstances here are not easily analogized to a basketball bank shot, we take the Tenth Circuit's point and agree with its analysis. Here, the individual defendants purposely targeted Tamburo and his business in Illinois with the express goal of inflicting commercial and reputational harm on him there, even though their alleged defamatory and otherwise tortious statements were circulated more diffusely across the Internet.[10] Tortious acts aimed at a target in the forum

---

[10] In a case involving a stand-alone Internet-based defamation, *Calder* might require a showing that the defendant intended to reach forum-state readers. *See Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir. 2002) (In a suit filed by a Virginia resident in Virginia district court against Connecticut newspapers for a defamatory online news article, "[s]omething more than posting and accessibility is needed . . . . The newspapers must, through the Internet postings, manifest an intent to target and focus on [forum-state] readers."). Because the newspaper in *Young*—the *New Haven Advocate*—clearly targeted a local audience, the case suggests that when a local publication posts an article on its website, jurisdiction in another state may be proper only if the publication specifically targets forum-state readers. But the analysis may be more complex when, for example, a truly national publication, such as *USA Today*, is

(continued...)

state and undertaken for the express purpose of causing injury there are sufficient to satisfy *Calder*'s express-aiming requirement. *See Dudnikov*, 514 F.3d at 1078 ("actions that 'are performed for the very purpose of having their consequences felt in the forum state' are more than sufficient to support a finding of purposeful direction under *Calder*" (quoting *Finley v. River N. Records, Inc.*, 148 F.3d 913, 916 (8th Cir. 1998))). Accordingly, we conclude that Dworkin, Henry, Hayes, and Mills "purposefully directed" their activities at Illinois; this prerequisite for the exercise of personal jurisdiction in Illinois has been met.

The same is not true, however, of Wild Systems, the Australian corporate defendant. Recall that DeJong, the owner and president of Wild Systems, allegedly

---

[10] (...continued)

sued for defamation arising out of an article on its website. In that context the Supreme Court's decision in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), is instructive. In *Keeton* the Court held that New Hampshire could exercise jurisdiction over a nationally circulated magazine, based in Ohio, when an article in the magazine defamed a New York resident. Emphasizing that the magazine "was a national publication aimed at a nationwide audience" and that it "continuously and deliberately exploited the [New Hampshire] market," the Court concluded that "[t]here is no unfairness in calling [the magazine] to answer for [its] contents . . . wherever a substantial number of copies are regularly sold and distributed." *Id.* We note, however, that the very broad conception of jurisdiction envisioned in *Keeton* likely applies only rarely.

facilitated the posting of some of the individual defen-
dants' tortious messages on the company's private
Breedmate Yahoo! email listserve. The complaint does not
say how many, nor does it describe the content of the
messages that were reposted onto the listserve. It
does not allege, for example, that DeJong reposted
emails specifically calling for a boycott of Tamburo's
Illinois-based business. And unlike the individual defen-
dants, there are no allegations that DeJong or anyone
else associated with Wild Systems acted with the knowl-
edge that Tamburo operated his business in Illinois or
with the specific purpose of inflicting injury there. In
short, we cannot conclude that DeJong's reposting of an
unspecified number of messages of unspecified (but
tortious) content to a private listserve of unspecified
scope and reach is enough to establish that Wild
Systems "expressly aimed" its allegedly tortious con-
duct at Illinois. As such, the claims against Wild
Systems were properly dismissed for lack of personal
jurisdiction.

### b. Injury "arises out of" the defendants' contacts with forum state

Our conclusion that the individual defendants' conduct
was "purposely directed" at the forum state does not end
the jurisdictional inquiry. Tamburo's injury must "arise
out of" or "relate to" the conduct that comprises the
defendants' contacts with the forum. *See Burger King*, 471
U.S. at 472. The Supreme Court has not elaborated on this
requirement, *see Helicopteros*, 466 U.S. at 415 n.10, and the

occasional difficulty in applying it has led to conflict among the circuits.[11]

The First Circuit has held that at least with respect to intentional tort claims, the defendant's contacts with the forum must constitute both the cause in fact and the proximate cause of the injury. *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 35 (1st Cir. 1998). The Ninth and Fifth Circuits, on the other hand, require only that the contacts constitute a but-for cause of the injury. *Doe v. Am. Nat'l Red Cross*, 112 F.3d 1048, 1051 n.7 (9th Cir. 1997); *Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1270 n.21 (5th Cir. 1981); *see generally Dudnikov*, 514 F.3d at 1078 (outlining this conflict); *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 102-05 (3d Cir. 2004) (Scirica, C.J., concurring in part and dissenting in part) (same).

The Third Circuit has taken a middle-ground approach, holding that "specific jurisdiction requires a closer and more direct causal connection than that provided by the but-for test," but has not adopted a precise rule, opting instead to proceed on a case-by-case basis. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 323 (3d Cir. 2007). Because personal jurisdiction can be conceptualized as a quid pro quo by which the defendant submits to the forum's jurisdiction in exchange for the benefit of its laws, the Third Circuit suggests that "[t]he causal connection can be somewhat looser than the tort concept of

---

[11] The Supreme Court granted certiorari on this issue in *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 589 (1991), but decided the case on other grounds.

proximate causation, but it must nonetheless be intimate enough to keep the quid pro quo proportional and personal jurisdiction reasonably foreseeable*." Id.* (citation omitted).

We have not weighed in on this conflict and need not do so here.[12] Under even the most rigorous approach to the determination of whether the plaintiff's injury "arises out of" the defendant's contacts with the forum state, Tamburo's injury clearly does. We have already concluded that Dworkin, Henry, Hayes, and Mills expressly aimed their allegedly tortious conduct at Tamburo and his Illinois-based business for the purpose of causing him injury there; these "contacts" with the forum state are the cause in fact and the legal cause of Tamburo's injury. That is, Tamburo's claims arise directly out of the individual defendants' contacts with Illinois. *See RAR*, 107 F.3d at 1278 (in a contract case, holding that "the action must *directly arise* out of the specific contacts between

---

[12] An additional approach, adopted by the Second Circuit, is a sliding-scale analysis that considers the connection between the contacts and the lawsuit. *See Chew v. Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998). Under this analytical framework, "the relationship between the contacts and the suit can be weaker when the contacts themselves are more extensive." *Dudnikov*, 514 F.3d at 1078 (discussing this approach). We rejected this approach in *RAR*, instead concluding that aggregating contacts in this manner would not provide a defendant adequate notice that a particular transaction or act would subject him to the forum state's jurisdiction. 107 F.3d at 1277; *see also Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 716-17 (7th Cir. 2002).

the defendant and the forum state'" (quoting *Sawtelle v. Farrell*, 70 F.3d 1381, 1389 (1st Cir. 1999) (emphasis added in *RAR*))).

### c. Traditional notions of fair play and substantial justice

Our final inquiry is whether Illinois' exercise of personal jurisdiction over Dworkin, Henry, Hayes, and Mills would offend traditional notions of fair play and substantial justice. *See Int'l Shoe*, 326 U.S. at 316. The following factors are relevant: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies*." Burger King*, 471 U.S. at 477 (internal quotation marks omitted). Applying these factors here, we see no unfairness in permitting this suit to proceed against the individual defendants in Illinois.

First, Illinois has a strong interest in providing a forum for its residents and local businesses to seek redress for tort injuries suffered within the state and inflicted by out-of-state actors. Although Tamburo could have sued the individual defendants in their home jurisdictions, that would have been cumbersome and impractical; the American defendants live in separate states and Dworkin lives in Canada. Neither Canada nor any of the states where the American defendants live (Colorado,

Michigan, or Ohio) has a substantial interest at stake here. And it would be unreasonable to expect Tamburo to file separate lawsuits to give each defendant the privilege of defending this litigation in his or her home state when jurisdiction is otherwise proper in Illinois. Under these circumstances, it is far more reasonable to conclude that the defendants should anticipate being haled into court in Tamburo's home state of Illinois than a court in a codefendant's home jurisdiction. A single suit in Illinois also promotes the most efficient resolution of these claims. *See Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 54 (7th Cir. 1996). Accordingly, we conclude that the exercise of personal jurisdiction in Illinois over Dworkin, Henry, Hayes, and Mills comports with traditional notions of fair play and substantial justice.

For the foregoing reasons, we AFFIRM the district court's order dismissing all counts against Wild Systems for lack of personal jurisdiction and also AFFIRM the dismissal of the antitrust claims against all defendants for failure to state a claim. We REVERSE the district court's order dismissing the state-law tort claims against Dworkin, Henry, Hayes, and Mills for lack of personal jurisdiction and REMAND the case for further proceedings.