MANION, Circuit Judge,
concurring.
I agree with the court that personal jurisdiction in Illinois is proper. I write separately because under the facts of this case, I would apply a more limited formula for connecting GoDaddy’s contacts in Illinois with uBID’s claim. In my view, personal jurisdiction in Illinois is proper for the simple reason that uBID is headquartered in Illinois, and that is where GoDaddy has directed, and uBID will be affected by, the harm at issue.
This is a difficult case, in a difficult area of the law. Our case law centers on ambiguous tests and turns on varying facts that prevent courts and practitioners from discerning bright lines. Looking at the same set of cases with the same set of facts, reasonable minds can disagree about whether and how a certain combination of facts suffices to establish personal jurisdiction. This is such a case.
There are three contacts that tie GoDaddy to Illinois: one, its advertising at sporting events in Illinois; two, its website service contracts with hundreds of thousands of Illinois residents; and three, the advertising it places on “parked pages” with domain names that infringe on uBID’s trademark. Following Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), the court emphasizes the importance of the first two contacts and finds that the plaintiffs claim arises out of them. Under the court’s analysis, the contacts and the claim under the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) (“Act”), are close enough to make “the relatedness quid pro quo balanced and reasonable.” *434 Op. at 430-31. Thus, it is fair that GoDaddy should be held accountable in Illinois.
The court’s formula for connecting Go-Daddy’s contacts in Illinois with uBID’s claim is, in my view, unnecessarily broad. uBID’s claim is not that GoDaddy’s conduct violates the Act when it merely registers an infringing domain name. In fact, such a claim would not be actionable under the Act, which limits liability to damages “for the registration or maintenance of a domain name” where there is “a showing of bad faith intent to profit from such registration or maintenance of the domain name.” Id. § 1114(2)(D)(iii) (emphasis added). Rather, uBID claims that GoDaddy is acting as a cybersquatter or typo-squatter, depending on what derivative of uBID’s domain name is used. In this capacity it takes these infringing domain names, puts up a parked page, and on the parked pages places links and advertisements to other websites — advertisements that GoDaddy exclusively controls. Most of these links and advertisements are for uBID’s competitors. For example, when someone mistakenly searches for uBID by typing “youbid,” he is directed to a parked page covered with advertisements for uBID’s competitors. When the person clicks on one of the advertisements, Go-Daddy generates revenue for itself.
According to uBID, GoDaddy engages in a heightened form of cybersquatting, by trafficking these infringing domain names and placing advertising on them to generate revenue for itself. In this way, GoDaddy has monetized the infringing domain names and violated the Act. Complaint ¶ 32. According to uBID, GoDaddy’s behavior has taken three forms: one, it has trafficked in these deceptive domain names, even when it knew they were identical or confusingly similar to uBID’s protected and valuable marks; two, it has offered to sell or otherwise assign the deceptive domains for financial gain; and three, it has trafficked in and used these deceptive domain names to divert customers from uBID’s website. Id. ¶¶ 41-43. In sum, GoDaddy is engaged in cybersquatting. Of course, GoDaddy denies all of this.
The problem with cybersquatting websites is well-documented. J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 25:77 (4th ed. 2010). These websites and domain names do not exist for a legitimate purpose. Instead, the owners wait for a company like uBID to buy the infringing domain name, and in the meantime GoDaddy as then-licensee helps siphon customers away from uBID by drawing the typo-prone to uBID’s competitors. Understood in this way, the claim uBID has against GoDaddy does not relate to GoDaddy’s contracts with hundreds of thousands of Illinois residents, nor does it arise out of its advertising at sporting events. Instead, the claim centers on how GoDaddy’s actions with these infringing domain names constitutes cybersquatting.
By viewing the claim this way, the Keeton analysis does not govern. Rather, the analysis from Colder v. Jones, 465 U.S. 783, 789-90,104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), for intentional harms directed at other states should be used. Although the distinction may be slight, the result is significant. Using the Keeton formula subjects GoDaddy to personal jurisdiction for uBID’s claim in any state that GoDaddy advertises and has customers — including at least one customer who registers an infringing domain name. That could be every state in the Union. While Hustler Magazine expressed similar shock at being haled into a New Hampshire court, a few billboards and clients in a state and web advertisements are not the same as 15,000 *435 copies of a libelous magazine in the hands of people located there.
Using the analysis from Calder fits with the harm GoDaddy alleges and accords with the way we and other circuits have analyzed personal jurisdiction in these sorts of cases involving the internet.[1] Calder has three requirements for personal jurisdiction: (1) intentional conduct; (2) expressly aimed at the forum state; (3) with the defendant’s knowledge that the plaintiff would be injured in the forum state. Tamburo, 601 F.3d at 703. GoDadd's alleged bad faith covers all three. First, GoDaddy’s conduct is intentional. Normally, a trademark violation does not have to be intentional. McCarthy, supra § 32.38. But in this case it does: to have a claim under the Act, uBID must show that GoDaddy acted with a bad-faith intent to profit from the registration or maintenance of the domain name. 15 U.S.C. § 1114 (2)(D) (iii). In this context, “bad faith” can be established in many ways. Id. § 1125(d)(1)(B)(i) (providing a non-exhaustive list of nine factors for courts to consider); see also McCarthy, supra § 25.78 (discussing each). Two of the four factors that indicate “bad faith” involve knowledge of the rightful owner and knowledge that the actions will harm the owner’s mark or business. Id. (specifically factors 5 and 6). And uBID’s allegations of intentional conduct closely track the language of the statute.
Second, this intentional conduct is aimed at Illinois. uBID’s claim is that GoDaddy is engaged in cybersquatting and typosquatting. Both activities are done around and in reference to a legitimate and valuable domain name. Cybersquatters register these domain names to force “the rightful owners of the marks to pay for the right to engage in electronic commerce under their own brand name.” Virtual Works, Inc. v. Volkswagen of America, 238 F.3d 264, 267 (4th Cir.2001) (quotation omitted). Cybersquatting is nothing more than a scheme to defraud businesses. It is not carried out aimlessly or indiscriminately but targeted against the rightful owner in hopes they will pay for the infringing website, rather than incur the costs of going through the courts. Id.; Coca-Cola Co. v. Purdy, 382 F.3d 774, 778 (8th Cir.2004). The complaint alleges that GoDaddy diverts customers to uBID’s competitors and diminishes the value of uBID’s domain name, until uBID buys the infringing domain name or attains it through legal action. E.g., Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214 (4th Cir.2002) (an example of such an action). In this way, the conduct is aimed at uBID’s headquarters, in Illinois, where it will be harmed because of lost revenue. See Panavision Int’l L.P. v. Toeppen, 141 F.3d 1316, 1322 (9th Cir.1998).
Third, uBID’s claim is that GoDaddy engaged in cybersquatting. If this is proven, these would not be random, fortuitous, or attenuated acts: rather, these are intentional, deliberate, and targeted acts against uBID. GoDaddy knew the harm was directed at Illinois: it knew that uBID, domiciled in Illinois, owned the UBID.com domain name, and it knew that these pages infringed on that name. What is more, it trafficked and profited from the domain names until uBID sought to buy them or stop them through the courts. *436 Toeppen, 141 F.3d at 1322. In practical terms, this is a targeted scheme against uBID: a scheme that affects its bottom line. And this affects it in Illinois, where uBID is incorporated, where it pays state income and property taxes, and where it has many employees. See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (noting “it is that the defendant’s conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.”).
The fact that uBID is incorporated in Illinois and the natural and deliberate impact GoDaddy’s actions will have on uBID is in Illinois distinguishes Illinois from every other state where GoDaddy simply advertises and has customers. And Go-Daddy’s intentional acts directed at uBID and their effect on uBID are what allow Illinois’s long-arm statute to reach GoDaddy. See Lovelady, 544 F.3d at 1288; Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. P’ship, 34 F.3d 410, 411-412 (7th Cir.1994). That being said, I agree with the court that there is tension in our case law about the scope and limits of the “express aiming” test from Calder. Op. at 427-28, n. 1. It has been well documented. Nerds on Call, Inc. (Indiana) v. Nerds on Call, Inc. (California), 598 F.Supp.2d 913, 916-19 (S.D.Ind.2008) (Hamilton, J.) (cited and discussed in Tamburo, 601 F.3d at 706). But that tension is not a reason to shy away from using Calder in cases like this, where the intentional acts are clearly directed at Illinois. And to the extent that “something more” is required, the court’s opinion and the myriad of facts it recounts about GoDaddy’s behavior in Illinois satisfies even the strictest ideas of what constitutes “something more.”
Again, this is not a well-developed area of the law, and reasonable minds can disagree on what facts are important, the way a harm should be framed, and the analysis to use. While I agree with much of the court’s analysis, I write separately to emphasize that uBID is headquartered in Illinois, which is what I see as the critical link between GoDaddy’s actions and finding it subject to personal jurisdiction in Illinois: given the nature of the complaint we should apply the analysis from Calder v. Jones.
For these reasons, I respectfully concur in the court’s judgment.

. E.g., Tamburo v. Dworkin, 601 F.3d 693, 703 (7th Cir.2010); Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1156 (9th Cir.2006); Revell v. Lidov, 317 F.3d 467, 472-73 (5th Cir.2002); ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707 (4th Cir.2002); Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1068 (10th Cir.2008); Licciardello v. Lovelady, 544 F.3d 1280, 1288 (11th Cir.2008); see also Teresa J. Cassidy, Civil Procedure — Effects of the "Effects Test," 9 Wyo.L.Rev. 575, 591-92 (2009).