FILED
United States Court of Appeals
Tenth Circuit

June 14, 2010

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

DAVID SILVER,

Plaintiff-Appellant,

v.

MATTHEW BROWN; JACK
MCMULLEN,

Defendants-Appellees,

and

GROWTH TECHNOLOGIES
INTERNATIONAL,

Defendant.

No. 10-2005
(D.C. No. 1:09-CV-00510-JB-ACT)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

Before **McKAY**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **EBEL**,
Circuit Judge.

---

[*]      After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is
therefore ordered submitted without oral argument.  This order and judgment is
not binding precedent, except under the doctrines of law of the case, res judicata,
and collateral estoppel.  It may be cited, however, for its persuasive value
consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Plaintiff-appellant David Silver, appearing pro se, appeals the district court's dismissal of his slander, defamation of character, and duress claims against defendants-appellees Matthew Brown and Jack McMullen in this diversity-of-citizenship case. As relevant for purposes of this appeal, Mr. Silver, a citizen of New Mexico, asserted that Mr. Brown and Mr. McMullen, citizens of Florida, had slandered him, defamed his character, and caused him duress, by posting a "web log" or "blog" on the internet that portrayed him in a negative light. The district court dismissed Mr. Silver's claims for lack of personal jurisdiction, holding that, under New Mexico's long-arm statute, neither Mr. Brown nor Mr. McMullen had sufficient contacts with New Mexico to provide the court with jurisdiction over them. Our jurisdiction is under 28 U.S.C. § 1291. Because we believe that the court erred in its jurisdictional analysis regarding the tort claims against Mr. Brown, we affirm the court's dismissal as to Mr. McMullen, reverse the court's dismissal as to Mr. Brown, and remand the case to the district court for further proceedings.

I.

The genesis of this dispute was an agreement entered into between Northern Hills, Inc., doing business as Sante Fe Capital Group (Santa Fe) and Growth Technologies International, Inc. (GTI). Mr. Silver was the president of Santa Fe, Matthew Brown was the chief executive officer of GTI, and Mr. McMullen was a member of GTI's board of directors. In that agreement,

-2-

Santa Fe agreed to assist GTI in raising money from private "angel investors" in exchange for a fee. It suffices to say that after some, but not all, of Santa Fe's fee had been paid, relations between the companies and their officers soured. Mr. Silver then sought the remainder of the fee he alleged was due Santa Fe and Mr. Brown sought a refund of the portion previously paid by GTI. The basis for Mr. Silver's personal tort claims for slander, defamation, and duress against Mr. Brown and Mr. McMullen was a "blog" that Mr. Brown posted to the internet regarding this conflict, with the intent of negatively affecting Mr. Silver's and Santa Fe's reputation.[1]

The domain name of the blog in question is "DavidSilverSantaFe.com." Mr. Silver attached a copy of what is apparently the first page of the blog to his complaint. The title of the blog is "A Special Report on David Silver and the Santa Fe Capital Group." R., Vol. 1 at 24. The first page contains an introduction to the blog written by Mr. Brown. It reads:

> This site is dedicated to providing a blog and information regarding Companies that have dealings with David Silver and Santa Fe Capital group. Our company was involved in a transaction that became a nightmare and we are in the process of gathering all content and correspondence with David Silver and employees of Sant[a] Fe Capital group to be posted on this new "social network for businesses wishing to raise capital". Hopefully other companies and individuals

---

[1]	A "blog" is short for "weblog" and is defined as "a Web site that contains an online personal journal with reflections, comments, and often hyperlinks provided by the writer; *also*: the contents of such a site." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/blog (last visited May 13, 2010).

in the "capital raise" scenario might not fall prey to what appears to be a scheme to prey on those needing to raise capital through David Silver's group.

*Id*. Mr. Brown then posts a web address for an article about "what appears to be the latest company that has contracted David Silver's Group" and states that he hopes that the company "will have better luck than we did . . . ." *Id*. Mr. Brown goes on to state:

> I will be linking to Blog's [sic] in the near future which provide resources to reputable venture funds and a CNN blog which has articles on Santa Fe.
>
> I hope this site will help other companies and individuals understand and communicate their transactions with David Silver and Santa Fe Capital group.
>
> We will launch all correspondence and a blog for others to participate in what we hope becomes a social network platform for David Silver and others.

*Id*. Under the "Latest News" heading appear to be five bullet-pointed hyperlinks:

- David Silver is a thief
- David Silver
- David Silver is a Thief
- CNN blog
- cnn blog

*Id*. According to the "Main Menu" for the website, it has four parts: "Home"; "The Blog"; Newsroom"; and "The Forum." *Id*.

Mr. Silver also attached to his complaint a copy of an e-mail exchange between himself and Mr. Brown regarding the blog. There is an e-mail dated April 29, 2009, evidently from Mr. Brown to Mr. Silver, that reads:

-4-

BTW:
I have two developers doing SEO work on [the blog] right now . . . . .
I'm glad Bob called to remind me that we need to be launched this
week!  I went through this one time with an investment firm . . . . .
and the ruling was . . . as long as the information is factual, we can
tie this thing up for years!

Its real easy . . . . . send back our 6K for services that were not
rendered . . . . . . . and on top of it, send me the mailing information,
copies of bills for all the administrative things we were charged for .
. . . .

~Matt

*Id*. at 26.[2]

The next e-mail is from May 4, 2009, and was sent from Mr. Brown to

Mr. Silver and Mr. McMullen (but addresses only Mr. McMullen).  It reads:

---

[2]     The phrase "SEO" appears to stand for "search engine optimization," which
basically means taking steps to ensure that your website is shown first, or as close
to first as possible, when the topic of your website is searched for on an internet
search engine such as Google or Yahoo!.

> A number of scholars have described both how search engines
> operate and how they have become a crucial intermediary between
> the user and digital information.  That Google's homepage, which
> contains virtually no content, is the most visited site in the United
> States indicates the extent to which people use search engines to
> access the online world.  Advertisers were estimated to spend eleven
> billion dollars on advertising with search engines in 2008, reflecting
> the sheer economic power of the industry.  Indeed, an entirely new
> industry, search engine optimization ("SEO"), has arisen to assist
> website owners in improving their rankings in search engine results,
> a fact that emphasizes search engines' role as a gatekeeper and driver
> of the online economy.

Viva R. Moffat, *Regulating Search*, 22 Harv. J.L. & Tech. 475, 481-82 (Spring,
2009) (footnotes omitted).

Jack,

I have not received a refund from David.  Have You?  We have installed a product called Joomla . . . . . which will integrate a full blog site for www.DavidSilverSanteFe.com; this product also integrates postings to Google and Yahoo, which will help drastically with keyword management for search engine exposure!

I should have it up by the end of the day!

*Id*. at 27.

Mr. Silver responded to this e-mail, asked for the stock and funds Santa Fe was still owed, reminded Mr. Brown that the agreement provided for disputes to be settled by arbitration, and warned Mr. Brown that he would be sued in federal district court in New Mexico–and "could end up having to frequently appear [there]"–if he disparaged Mr. Silver or Santa Fe.  *Id*.

Mr. Brown responded:  "Real simple, I do not give a [expletive]!  I am launching at the end of the day . . . and copying a server in Hong Kong out of my control, which will not be managed by us!  Refund our money or stop sending emails!"  *Id*.  Mr. Silver responded that if he "got one single call from a member of the public that he saw [the] blog" he was going to bring disparagement and interference-with-business claims in New Mexico.  *Id*.

According to the complaint, the blog was posted to the internet on, or about, May 5, 2009.  Mr. Silver sent an e-mail on May 20, 2009, to Mr. McMullen that read:  "Jack:  I[']m counting the dollars and long-run damage

that [GTI] is doing to my name. You will be named in the suit. David." *Id*. at 25. Mr. Brown responded on May 21:

> David,
>
> Your scare tactics will never work . . . . . I will never remove that site, unless I am proved wrong and Jack and [GTI] are refunded. I will give you the name of the two people who were going to send you a retainer (who will not now) [. . .] so go ahead and Sue me . . . . . That will gain more traction for the blogs!!!!! If a court orders me (which will be years down the road), I will send it to a Korea hosting site, which cannot be removed . . . . . . you will not win this![ . . .]
>
> Simply refund the money . . . . . . . .
>
> I warned you this would happen . . . and its going to get much worse, we have daily signups and people asking the moderator about you, which I respond to . . . . . I have better things to do with my time!
>
> Please advise, how you want me to proceed!
>
> As in every email I will send you, I hope it was worth the $3,750.00 . . . .
>
> ~Matt

*Id*.

Mr. Silver filed his pro se federal complaint five days later on May 26, 2009. After a hearing, the district court dismissed Mr. Silver's tort claims against defendants-appellees for lack of personal jurisdiction. Mr. Silver has appealed the dismissal of his slander, defamation, and duress claims against Mr. Brown and Mr. McMullen.

II.

We turn first to Mr. Silver's claims against defendant-appellee Jack McMullen. The district court dismissed Mr. Silver's claims against Mr. McMullen arising out of the blog based on its finding that Mr. Silver "ha[d] not demonstrated that McMullen was significantly associated with the blog or controlled it in any way." R., Vol. 1 at 178. Although Mr. Silver claims to be appealing the jurisdictional ruling as to both appellees–he complains the "Appellees" disparage him with the blog, *see* Aplt. Br. at 2 ("Appellees knew, or should have known, that they might have to defend a law suit in New Mexico when they put up the disparaging blog.")–he does not directly challenge the district court's finding that Mr. McMullen did not start or control the blog. Accordingly, Mr. Silver has waived any challenge to the district court's dismissal of his claims against Mr. McMullen.[3] *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived[.]"). Thus, we affirm the district court's dismissal of Mr. Silver's claim against Mr. McMullen.

---

[3] Mr. Silver could not effectively challenge that finding anyway, because he has failed to provide this court with a copy of the transcript of the evidentiary hearing held on the motion to dismiss. Under Federal Rule of Appellate Procedure 10(b) and 10th Circuit Rule 10.1(a)(1), it is the appellant's duty to provide us with all portions of the transcript necessary for the appeal.

We therefore turn to Mr. Silver's argument that the district court erred in holding that Mr. Brown's posting of the blog did not provide the district court with jurisdiction over him.[4]

As to the applicable test for personal jurisdiction, "our analysis begins with two questions. First, we ask whether any applicable statute authorizes the service of process on defendants. Second, we examine whether the exercise of such statutory jurisdiction comports with constitutional due process demands." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008). As to the first question, Federal Rule of Civil Procedure 4(k)(1)(A) commands the district court to apply the law of the state in which the district court sits. As properly recognized by the district court, New Mexico's long-arm statute provides:

> A. Any person, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts enumerated in this subsection thereby submits himself or his personal representative to the jurisdiction of the courts of this state as to any cause of action arising from:
>
> . . . .
>
> (3) the commission of a tortious act within this state;

---

[4] Mr. Silver's failure to provide us with the transcript of the evidentiary hearing has little effect on this purely legal argument. The parties generally agree on what Mr. Brown did in posting the blog; they disagree on the legal effect of those actions. To the extent that Mr. Silver posits facts on appeal that are contrary to the district court's findings, they have been ignored.

. . . .

C. Only causes of action arising from acts enumerated in this section may be asserted against a defendant in an action in which jurisdiction is based upon this section.

N.M. Stat. Ann. § 38-1-16 (1978). The New Mexico Supreme Court has held that the New Mexico long-arm statute is coextensive with the constitutional limitations imposed by the due process clause. *See Tercero v. Roman Catholic Diocese of Norwich*, 48 P.3d 50, 54 (N.M. 2002). "Thus, in our case, the first, statutory, inquiry effectively collapses into the second, constitutional, analysis." *Dudnikov*, 514 F.3d at 1070.

"The Supreme Court has held that, to exercise jurisdiction in harmony with due process, defendants must have 'minimum contacts' with the forum state, such that having to defend a lawsuit there would not 'offend traditional notions of fair play and substantial justice.'" *Id*. (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Minimum contacts can be established through general or specific personal jurisdiction.

General jurisdiction is based on an out-of-state defendant's "continuous and systematic" contacts with the forum state, and does not require that the claim be related to those contacts. Specific jurisdiction, on the other hand, is premised on something of a *quid pro quo*: in exchange for "benefitting" from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts.

-10-

*Id.* at 1078 (citation omitted).  Here, Mr. Silver asserts that the district court had specific jurisdiction over Mr. Brown.

As to specific jurisdiction, "the Supreme Court has instructed that the 'minimum contacts' standard requires, first, that the out-of-state defendant must have 'purposefully directed' its activities at residents of the forum state, and second, that the plaintiff's injuries must 'arise out of' defendant's forum-related activities."  *Id.* at 1071 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  Finally, "exercising personal jurisdiction over defendants must always be consonant with traditional notions of fair play and substantial justice."  *Id.*

## A.

As to the first requirement for specific jurisdiction, "[i]n the tort context, we often ask whether the nonresident defendant 'purposefully directed' [his] activities at the forum state."  *Id.* at 1071.  We think it is clear from *Calder v. Jones*, 465 U.S. 783 (1984), that Mr. Brown purposefully directed his blog at New Mexico, and that Mr. Silver's alleged injuries arise out of Mr. Brown's New Mexico-related activities.

In that case, actress Shirley Jones, who starred in the television show "The Partridge Family," sued the National Enquirer, Inc. (Enquirer), and its local distributing company in California, for libel, invasion of privacy, and intentional infliction of emotional harm in response to an Enquirer article about her.  *Calder*,

465 U.S. at 784-85. Ms. Jones also sued the writer and editor of the article. While the Enquirer and its distributor did not contest jurisdiction, the writer and editor did. The ultimate state court ruling was that the California courts had personal jurisdiction over the defendants. The United States Supreme Court agreed.

The Court held that "[i]n judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Id*. at 788. It noted that, while "[t]he plaintiff's lack of 'contacts' [with the forum state] will not defeat otherwise proper jurisdiction, . . . they may be so manifold as to permit jurisdiction when it would not exist in their absence." *Id*. (citation omitted). The writer and editor had argued that "they [were] not responsible for the circulation of the article in California[,]" that they had "no direct economic stake in their employer's sales in a distant State[,]" and that they were not "able to control their employer's marketing activity." *Id*. at 789. They argued that the mere foreseeability of damage occurring in California was not sufficient to establish jurisdiction.

The court held that the "petitioners [were] not charged with mere untargeted negligence" but, instead, "intentional, and allegedly tortious, actions [that] were expressly aimed at California." *Id*. The court held that "[u]nder the circumstances, petitioners must reasonably anticipate being haled into court there to answer for the truth of the statements made in their article" and that "[a]n

-12-

individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California." *Id*. at 790 (quotation omitted). This court has written:

> Distilling *Calder* to its essence, we thus understand the Court to have found purposeful direction there because of the presence of (a) an intentional action (writing, editing, and publishing the article), that was (b) expressly aimed at the forum state (the article was about a California resident and her activities in California; likewise it was drawn from California sources and widely distributed in that state), with (c) knowledge that the brunt of the injury would be felt in the forum state (defendants knew Ms. Jones was in California and her career revolved around the entertainment industry there).

*Dudnikov*, 514 F.3d at 1072. These factors are met in this case.

First, the posting of the blog was clearly an intentional act. Mr. Brown created the blog in question in direct response to the failed business deal and, in fact, used the threat of posting to attempt to recover money he thought GTI was owed. He served as moderator of the blog and wrote at least the introductory page claiming his company had been wronged by Mr. Silver and Santa Fe and expressing the hope that "other companies and individuals in the 'capital raise' scenario might not fall prey to what appears to be a scheme to prey on those needing to raise capital through David Silver's group." R., Vol. 1 at 24. His clear intention was to damage Mr. Silver's and Santa Fe's reputation.

Mr. Brown also expressly aimed his blog at New Mexico. It was about a New Mexico resident and a New Mexico company. The blog complained of Mr. Silver's and Santa Fe's actions in the failed business deal. Those actions

occurred mainly in New Mexico. And the blog was widely available in New Mexico over the internet and all the various ways the internet may be accessed in this day and age.

Finally, Mr. Brown had knowledge that the brunt of the injury to Mr. Silver would be felt in New Mexico. Mr. Brown knew Santa Fe was located in New Mexico and that Mr. Silver lived in New Mexico and conducted his business from there. In the affidavit he submitted in support of his response to defendants' motion to dismiss, Mr. Silver averred that he "founded the Venture Capital Club of New Mexico and funded dinner meetings for eleven years, one evening a month at which New Mexico entrepreneurs pitched their 'deals' to angel investors," and that his work had "helped create or save employment for more than 3,000 people in New Mexico." *Id*. at 76. While Mr. Silver clearly has many contacts outside New Mexico, that state is unquestionably the center of his business activities.

The district court, in holding that Mr. Brown's contacts with New Mexico were "tenuous" appears to have disagreed that the brunt of the injury would be felt in New Mexico. The court found it important that "the blog is not a website that is directed solely at the people of New Mexico" and that "[t]he number of people who can access the website in New Mexico in comparison to those who are able to access the website throughout the world, or even in the United States, . . . is nominal." *Id*. at 177. The court also pointed out that, despite the domain

-14-

name of the blog being "DavidSilverSantaFe.com," there were other cities called Santa Fe, many businesses not located in New Mexico that used "Santa Fe" in their names, and there were obviously other men named David Silver. We think this analysis disregards the ubiquitous nature of search engines.

The district court's analysis would make some sense if the internet was more like television, or radio, or print media; but it is not. In the past, the population listened to television, or radio, or read the newspaper, and got generally the same content. But technology in general, and the internet in particular, has allowed for greater and greater specialization of information. On the internet, a person can pick what television shows to watch at what time, listen to radio stations from around the world, access news and opinions from a fabulous array of sources, and purchase products from vendors worldwide. It would be impossible to quickly and efficiently navigate such a tremendous amount of information if not for the increasing sophistication and use of search engines on the internet. But those sophisticated search engines do exist, and with their use it is becoming more and more irrelevant, for the purposes of our analysis, how many worldwide or nationwide internet connections there are, or how many men named David Silver exist in the world, because, with the use of these search engines, the people that are searching for information on *this* David Silver are the ones who are going to end up viewing Mr. Brown's blog. And Mr. Brown *knows* this, as evidenced by the concern for increased search engine

optimization expressed in his e-mails. Consequently, it is clear that this is not a case of untargeted negligence that just happened to cause damage in New Mexico. "[A]ctions that 'are performed for the very purpose of having their consequences felt in the forum state' are more than sufficient to support a finding of purposeful direction under *Calder*." *Dudnikov*, 514 F.3d at 1078 (quoting *Finley v. River North Records, Inc.*, 148 F.3d 913, 916 (8th Cir. 1998)).

B.

We also think that it is clear that Mr. Silver's alleged injuries "arise out of" Mr. Brown's contacts with New Mexico. The facts in this case are similar to the recent case of *Tamburo v. Dworkin*, 601 F.3d 693 (7th Cir. 2010), which we find persuasive. In that case, Mr. Tamburo, a software designer who lived and operated his business in Illinois, designed software for use by dog breeders and enthusiasts. He incorporated information regarding dog pedigrees that he gleaned from the internet into an online database that he then sold to customers. Much of the information gleaned was from websites owned by four individuals located in Colorado, Michigan, Ohio, and Canada. When these individuals found out about Mr. Tamburo's use of their information, they posted statements on their websites "accusing Tamburo of 'theft,' 'hacking,' and 'selling stolen goods,' and calling on readers to boycott his products. They also posted Tamburo's Illinois address on their websites and urged readers to contact him to harass him and otherwise complain." *Id*. at 698. Mr. Tamburo sued these individuals in the federal court in

-16-

Illinois, alleging, among other claims, defamation, tortious interference with existing contracts and prospective economic advantage, trade libel, and civil conspiracy under Illinois law. The district court dismissed for lack of personal jurisdiction and the Court of Appeals for the Seventh Circuit reversed. The court held that defendants had purposely directed their conduct at Illinois.

Noting that "Tamburo's injury must 'arise out of' or 'relate to' the conduct that comprises the defendants' contacts with the forum[,]" *id*. at 708 (quoting *Burger King Corp.*, 471 U.S. at 472), the court recognized a circuit split regarding the causal connection required between a defendant's contacts with the forum state and the suit at issue. It noted that the First Circuit required that the forum contacts "must constitute both the cause in fact and the proximate cause of the injury," the Ninth and Fifth Circuits required that the forum contacts "constitute a but-for cause of the injury," and the Third Circuit required "a closer and more direct causal connection than that provided by the but-for test[,]" but had not adopted a precise rule. *Id*. (quotations omitted). We have also recognized the circuit split. *See Dudnikov*, 514 F.3d at 1078.

But the Seventh Circuit held that it need not take a position on the circuit split because

> [u]nder even the most rigorous approach to the determination of whether the plaintiff's injury "arises out of" the defendant's contacts with the forum state, Tamburo's injury clearly does. We have already concluded that [defendants] expressly aimed their allegedly tortious conduct at Tamburo and his Illinois-based business for the purpose of

-17-

causing him injury there; these "contacts" with the forum state are the cause in fact and the legal cause of Tamburo's injury. That is, Tamburo's claims arise directly out of the individual defendants' contacts with Illinois.

*Tamburo*, 601 F.3d at 709.

The same reasoning applies in this case. As discussed above, Mr. Brown's blog was expressly aimed at Mr. Silver and his New Mexico-based business for the purpose of causing him injury there. Thus, the contacts with the forum state from the blog are the cause in fact and the legal cause of Mr. Silver's injury.

## C.

The final requirement we have to consider is "whether the exercise of personal jurisdiction [over Mr. Brown] would 'offend traditional notions of fair play and substantial justice.'" *Dudnikov*, 514 F.3d at 1080 (quoting *Int'l Shoe*, 326 U.S. at 316). The factors to be considered in regard to this requirement are:

> (1) the burden on the defendant, (2) the forum state's interests in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effectual relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states . . . in furthering fundamental social policies.

*Id*. (quotation omitted); *see also Burger King Corp.*, 471 U.S. at 477 (setting forth factors). None of these factors weigh heavily in favor of Mr. Brown. The burden imposed on him in defending a lawsuit in New Mexico is no greater than what would be placed on Mr. Silver if forced to prosecute one in Florida. New Mexico has a strong interest in providing a forum for its residents to seek redress for tort

-18-

injuries suffered within the state. Further, "[f]alse statements of fact harm both the subject of the falsehood and the readers of the statement. [New Mexico] may rightly employ its . . . laws to discourage the deception of its citizens." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776 (1984). And, as to the last two factors, in a case such as this one, New Mexico would seem to provide the most efficient resolution of the controversy. While Mr. Brown was clearly trying to damage Mr. Silver's reputation as widely as possible, it seems clear that the most damage would be done in New Mexico. The location of Mr. Brown, or the computer server on which the electronic program underlying the blog operates, has little practical effect on the damage caused, as is clear from Mr. Brown's own e-mails. Mr. Brown could access the blog from anywhere and it is clear the program can run on any number of different servers and achieve the same access to the internet, including servers located in foreign countries. *See* R., Vol. 1 at 25 ("If a court orders me . . . I will send it to a Korea hosting site, which cannot be removed[.]"); *id.* at 27 ("I am . . . copying a server in Hong Kong out of my control[.]"). The damage is done when a person searching the internet for information about Mr. Silver runs across Mr. Brown's blog. *Cf. Keeton*, 465 U.S. at 777 ("The tort of libel is generally held to occur wherever the offending material is circulated."). The exercise of jurisdiction in New Mexico over Mr. Brown does not, therefore, offend traditional notions of fair play and substantial justice.

IV.

The judgment of the district court dismissing Mr. Silver's claims against Mr. McMullen for lack of personal jurisdiction is AFFIRMED. The judgment of the district court dismissing Mr. Silver's state-law tort claims against Mr. Brown is REVERSED, and the case is REMANDED to the district court for further proceedings.

Entered for the Court


Monroe G. McKay
Circuit Judge
