# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**JULIA BLACKWELL GELINAS**
**MAGGIE L. SMITH**
Frost Brown Todd LLC
Indianapolis, Indiana

**ROBERT D. EMMERSON**
**SCOTT SHOCKLEY**
Defur Voran LLP
Fishers, Indiana

ATTORNEYS FOR APPELLEES:

**DAVID K. HERZOG**
**JON LARAMORE**
**APRIL E. SELLERS**
Baker & Daniels LLP
Indianapolis, Indiana



FILED

Feb 29 2012, 9:34 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JOSEPH A. DAVIS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A04-1101-CT-5 |
| | ) | |
| HERBERT SIMON and BUI SIMON, | ) | |
| | ) | |
| Appellees-Plaintiffs. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Heather A. Welch, Judge
Cause No. 49D12-1005-CT-20141

**February 29, 2012**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Joseph A. Davis appeals the trial court's denial of his Motion to Dismiss for Lack of Personal Jurisdiction, or in the Alternative, on Grounds of Forum Non Conveniens (the "Motion to Dismiss"), in favor of Herbert and Bui Simon (collectively, "the Simons"). Davis raises four issues, which we consolidate and restate as whether the court erred in denying his Motion to Dismiss. We reverse.

The relevant facts follow.[1] On May 5, 2010, the Simons filed a complaint in the Marion County Superior Court alleging claims for defamation and false light publicity "based on false, malicious, and defamatory statements that Davis, a California lawyer, has made concerning the Simons to the media in Indianapolis." Appellant's Appendix at 21. The complaint alleged that Davis "is an attorney who maintains his law practice in Beverly Hills, California" and that Herbert Simon "has his personal domicile in Indianapolis, Indiana, but together with [Bui] also maintains a home in California. [Herbert] is a longtime Indianapolis resident, having maintained his principal office and residence in Indianapolis for more than fifty (50) years." Id. at 22. It also noted that Herbert "is Chairman Emeritus and co-founder of Simon Property Group, Inc., whose worldwide headquarters are in Indianapolis" that he "is the owner of the Indiana Pacers," and that Bui "lives primarily in Los Angeles, County, California, but visits Indianapolis several times a year" and is "a resident of California." Id. at 23.

The complaint recited the following allegations giving rise to the claims:

10.    On or about April 9, 2010, Davis purposefully communicated with WTHR, a news organization based in Indianapolis, and prompted WTHR to publish a story on the evening news (the "April 9 Broadcast") regarding a lawsuit that he had filed against the Simons

_____

[1] We held oral argument on January 25, 2012, in Indianapolis. We commend counsel for their well-prepared advocacy.

2

on behalf of the Simons' former house manager in California (the "California Lawsuit"), alleging that the Simons had wrongfully terminated her.

11.   On the April 9 Broadcast, Davis stated that,

> [t]he firing is because my client refused to engage in an unlawful, meaning a criminal, act pursuant to our immigration laws. . . .   This was all designed to conceal from local and state authorities the existence of this undocumented worker.

12.   Davis's statements in the April 9 Broadcast ("Davis's Statements") falsely portray the Simons as having committed criminal acts and having attempted to coerce another to commit a criminal act, representing those facts to be established and true, and without making clear that they are simply allegations in the California lawsuit.

13.   The Simons deny any and all wrongdoing alleged in the California lawsuit. . . .

Id. at 23.  The complaint contained attached exhibits which purport to demonstrate the falsity of Davis's statements to WTHR.

On July 1, 2010, Davis filed his Motion to Dismiss and his brief in support in which he argued that the court should dismiss the Simons' action pursuant to Ind. Trial Rule 12(B)(2) or, in the alternative, on grounds that the State of California is a more convenient forum.  In his Motion to Dismiss, Davis stated in part:

3.   Mr. Davis is not now nor has he ever owned property in the State of Indiana nor has he ever held a bank account, been employed, had a registered agent, advertised, or otherwise conducted business in the State of Indiana.

4.   Mr. Davis has not engaged in any acts that would provide a basis for personal jurisdiction in Indiana pursuant to Trial Rule 4.4(A) or the Due Process Clause.  Mr. Davis' only contacts with the State of Indiana resulted from his response to repeated inquiries from television station WTHR regarding lawsuits Davis filed in California on behalf of his clients.

3

Id. at 35-36. Attached to the Motion to Dismiss as Exhibit C was the affidavit of Davis in which Davis stated that he, in his capacity as an attorney practicing in California, filed three lawsuits in March or April 2010 on behalf of Robert G. Young and Claudia Leite, Mayra Acosta, and Beverly Du Jacques, in which the Simons were listed as defendants in each suit. Also, Davis stated in part:

> 43.  Prior to March 13, I was initially contacted by a reporter with WTHR in connection with the *Young Case*. The reporter informed me that WTHR had learned of the existence of the *Young Case* through a report distributed by TMZ. The reporter requested that I provide to it (WTHR) a copy of the Complaint in the *Young Case* but I declined and continue to decline to do so. Thereafter, WTHR requested that I provide to it (WTHR) a copy of the Complaint in the *Acosta Case* and *Du Jacques Case* and again, I declined and continue to decline to do so. Thereafter, WTHR notified me that it (WTHR) had obtained copies of the Complaints in the above cases by independent means.
>
> 44.  In or about April 2010, I was in California when WTHR contacted me by telephone indicating that it was prepared to take my recorded statement regarding Du Jacques, who is suing the Simons for wrongful termination. I was always in California when I spoke by telephone to WTHR. In the recorded statement, I repeatedly referred to the content of the Complaint in the *Du Jacques Case* and that it was Du Jacques (not me) making allegations as referenced in the Complaint, a public record accessible to anyone located anywhere in the world. WTHR did not provide any control to me nor did I have any control over how my comments were edited or how they were presented by WTHR in the context of its reporting. Nor was I provided an advance copy of anything that WTHR published or reported in advance of it doing so.

Id. at 76-77.

On August 16, 2010, the Simons filed their Opposition to Davis's Motion to Dismiss in which they stated in a footnote:

> Davis's suggestion that he did not initiate contact with WTHR means only that WTHR placed the call in which he gave the interview, not the other

way around. But Davis's affidavit says that WTHR "initially" contacted him "[p]rior to March 13" and then in April 2010 told him they were "prepared to take [his] recorded statement." (Davis Aff. ¶¶43, 44). So it appears that WTHR had contacted him earlier to arrange the interview. So who placed the call at the pre-arranged time is of no consequence. What is important is that Davis knowingly and voluntarily directed defamatory statements to Indiana with the understanding and intention that they would be published here. . . .

Id. at 170. The Simons' Opposition also contained the attached affidavit of Herbert Simon, in which Herbert stated that his principal office and residence are in Indianapolis, Indiana, and have been for more than fifty (50) years," that his "principal place for voting on most Election Days is in Indianapolis," that he files income taxes in Indiana, that he is "Chairman Emeritus and co-founder of Simon Property Group, Inc., whose worldwide headquarters are in Indianapolis," and that he is "the owner of the Indiana Pacers." Id. at 178.

On August 30, 2010, Davis filed his Reply in Support of Motion to Dismiss. On October 12, 2010, the court held a hearing on the Motion to Dismiss and arguments were presented by both parties. On October 27, 2010, the court entered an order denying Davis's Motion to Dismiss in its entirety.[2] On November 19, 2010, Davis filed a motion to certify the court's order for interlocutory appeal pursuant to Ind. Appellate Rule 14(B) which the court approved on December 12, 2010. On March 8, 2011, this court granted Davis's motion to accept jurisdiction of interlocutory appeal pursuant to Ind. Appellate Rule 14(B)(3).

---

[2] Specifically, the court entered an Amended Order Denying Davis's Motion to Dismiss for Lack of Personal Jurisdiction, or in the Alternative, on Grounds of *Forum Non Conveniens*. However, the record does not contain or allude to an initial order.

The issue is whether the court erred in denying Davis's Motion to Dismiss. We begin by addressing whether the court erred in determining that Davis had sufficient minimum contacts with the State of Indiana to find personal jurisdiction. "Personal jurisdiction is a question of law . . . ." LinkAmerica Corp. v. Albert, 857 N.E.2d 961, 965 (Ind. 2006) (quoting Anthem Ins. Co. v. Tenet Healthcare Corp., 730 N.E.2d 1227, 1237 (Ind. 2000)). "Because Indiana state trial courts are courts of general jurisdiction, jurisdiction is presumed." Everdry Mktg. and Mgmt., Inc. v. Carter, 885 N.E.2d 6, 10 (Ind. Ct. App. 2008). "The party contesting jurisdiction bears the burden of proving the lack of personal jurisdiction by a preponderance of the evidence, unless the lack of jurisdiction is apparent on the face of the complaint." Id. As with other questions of law, a determination of the existence of personal jurisdiction is entitled to *de novo* review by appellate courts, and is reviewed on a case-by-case basis. LinkAmerica, 857 N.E.2d at 965. We do not defer to the trial court's legal conclusion as to whether personal jurisdiction exists. Id. However, personal jurisdiction turns on facts, typically the contacts of the defendant with the forum, and findings of fact by the trial court are reviewed for clear error. Id. "Where the trial court did not find jurisdictional facts, we may accept the plaintiff's well-pleaded facts to the extent they are not challenged, and we may view challenged facts in favor of the plaintiff." JPMorgan Chase Bank, N.A. v. Desert Palace, Inc., 882 N.E.2d 743, 747-748 (Ind. Ct. App. 2008) (citing Anthem, 730 N.E.2d at 1238), trans. denied.

"The Due Process Clause of the Fourteenth Amendment requires that before a state may exercise jurisdiction over a defendant, the defendant must have 'certain minimum contacts with [the state] such that the maintenance of the suit does not offend

6

traditional notions of fair play and substantial justice.'"[3]  LinkAmerica, 857 N.E.2d at

967 (quoting Int'l Shoe Co. v. Wash., 326 U.S. 310, 316, 66 S. Ct. 154 (1945) (internal

quotation omitted)).  "If the defendant's contacts with the state are so 'continuous and

systematic' that the defendant should reasonably anticipate being haled into the courts of

that state for any matter, then the defendant is subject to general jurisdiction, even in

causes of action unrelated to the defendant's contacts with the forum state."  Id. (citing

Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415 n.9, 104 S. Ct.

1868 (1984)).

In cases where a defendant is not subject to general jurisdiction in a forum state,

"specific jurisdiction may be asserted if the controversy is related to or arises out of the

defendant's contacts with the forum state."  Id.  "Specific jurisdiction requires that the

defendant purposefully availed itself of the privilege of conducting activities within the

forum state so that the defendant reasonably anticipates being haled into court there."  Id.

(citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-475, 105 S. Ct. 2174 (1985)).

Also, "[a] single contact with the forum state may be sufficient to establish specific

jurisdiction over a defendant, if it creates a 'substantial connection' with the forum state

and the suit is related to that connection."  Id. (citing McGee v. Int'l Life Ins. Co., 355

U.S. 220, 223, 78 S. Ct. 199 (1957)).  "But a defendant cannot be haled into a jurisdiction

'solely as a result of random, fortuitous, or attenuated contacts or of the unilateral activity

---

[3] We note that the LinkAmerica Court held that an amendment to Indiana's long arm statute, Indiana Trial Rule 4.4(A), rendered inapplicable the two-pronged test for personal jurisdiction in Anthem, 730 N.E.2d at 1232, stating that "[r]etention of the enumerated acts found in Rule 4.4(A) serves as a handy checklist of activities that usually support personal jurisdiction but does not serve as a limitation on the exercise of personal jurisdiction by a court of this state."  857 N.E.2d at 967.  Thus, we "direct our analysis toward the constitutional safeguards found in the Fourteenth Amendment" of the Federal Constitution.  Everdry, 885 N.E.2d at 12.

7

of another party or a third person.'" Id. (quoting Burger King, 471 U.S. at 475, 105 S. Ct. 2174 (internal quotation marks omitted) (citing Helicopteros, 466 U.S. at 417, 104 S. Ct. 1868; Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774, 104 S. Ct. 1473 (1984); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 299, 100 S. Ct. 559 (1980))).

Once either general or specific jurisdiction has been established, "due process requires that the assertion of personal jurisdiction over the defendant is reasonable." Id. However, "[t]he assertion of personal jurisdiction will rarely be found unreasonable if 'minimum contacts' are found." Id. The Court cited to Burger King and set forth five factors to balance in determining reasonableness:

> (1) the burden on the defendant; (2) the forum State's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenience and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies.

Id. at 968 (citing Burger King, 471 U.S. at 476-77, 105 S. Ct. 2174).[4]

In this case, the parties agree that Davis is not subject to general personal jurisdiction and confine their arguments to specific jurisdiction. In particular, the parties argue over the application of the "express aiming test" first articulated in the United States Supreme Court case of Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482 (1984).[5] In

---

[4] Again, "[t]hese considerations come into play only if the defendant has sufficient contacts with the forum state to assert personal jurisdiction." LinkAmerica, 857 N.E.2d at 968 (citing Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 116, 107 S. Ct. 1026 (1987)).

[5] We note that the Calder test has been referred to as the "effects test." See, e.g., JP Morgan, 882 N.E.2d at 752 ("While we acknowledge the possible slippery slope and the importance of the 'effects test,' . . . ."). The Seventh Circuit has recently observed:

> In the past, the reasoning in Calder has been called the "effects test." We believe the phrase "express aiming test"-adopted by this court in Tamburo[ v. Dworkin, 601 F.3d 693, 697 (7th Cir. 2010), cert. denied, 131 S. Ct. 567 (2010)]-is more faithful to Calder. It properly focuses attention on whether the defendant intentionally aimed its conduct at

8

Calder, the plaintiff, a known entertainer, sued the defendant, a national magazine, in California for libel published in Florida and circulated in California. JP Morgan, 882 N.E.2d at 750 (citing Calder, 465 U.S. at 785, 104 S. Ct. 1482). Prior to publishing the allegedly libelous article, the defendant's reporter lived in Florida, did the majority of his research in Florida, made phone calls and wrote letters from Florida to California, and occasionally flew to California on business. Id. (citing Calder, 465 U.S. at 785-786, 104 S. Ct. 1482). The named defendant, Calder, was the president and editor of the magazine and had been to California once prior to the publication, for pleasure and not business. Id. (citing Calder, 465 U.S. at 785-786, 104 S. Ct. 1482).

The Court held that jurisdiction over the defendants in California was proper "because of their intentional conduct in Florida calculated to cause injury to [Jones] in California," noting that the defendants were "not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California." Calder, 465 U.S. at 790, 104 S. Ct. at 1487. The Court began its analysis by noting that "[i]n judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation,'" id. at 788, 104 S. Ct. at 1486 (quoting Shaffer v. Heitner, 433 U.S. 186, 204, 97 S. Ct. 2569, 2579 (1977)), but that "[t]he plaintiff's lack of 'contacts' will not defeat otherwise proper jurisdiction, but they may be so manifold as to permit jurisdiction when it would not exist in their absence." Id. (citation omitted). The Court held, as restated by a federal circuit decision,

the forum state, rather than on the possibly incidental and constitutionally irrelevant effects of that conduct on the plaintiff.

Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. Of Houston Metroplex, P.A., 623 F.3d 440, 445 n.1 (7th Cir. 2010). We agree with the Seventh Circuit's observation and will refer to the test laid out in Calder as the "express aiming test."

9

that in such cases where minimum contacts may be otherwise insufficient, constitutionally sufficient contacts can be imputed to a defendant if:

> (1)     The defendant committed an *intentional tort*;
>
> (2)     The plaintiff *felt the brunt of the harm in the forum* such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort;
>
> (3)     The defendant *expressly aimed his tortious conduct at the forum* such that the forum can be said to be the focal point of the tortious activity.

Remick v. Manfredy, 238 F.3d 248, 258 (3d Cir. 2001) (citing IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 265-266 (3d Cir. 1998) (examining Calder, 465 U.S. at 788-789, 104 S. Ct. at 1486-1487)).[6]

Recently, the Seventh Circuit examined the "express aiming test" and noted that Calder did not hold that "any plaintiff may hale any defendant into court in the plaintiff's home state, where the defendant has no contacts, merely by asserting that the defendant has committed an intentional tort against the plaintiff;" rather, its "express aiming" requirement "was merely one means of satisfying the traditional due process standard set out in International Shoe and its familiar progeny, not an independent path to jurisdiction that allowed a defendant to avoid 'minimum contacts' altogether." Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. Of Houston Metroplex, P.A., 623 F.3d 440, 445 (7th Cir. 2010). The court made clear that "'express aiming' remains the crucial requirement" in applying Calder. Id. at 445-446.

---

[6] We note that in federal decisions, including Remick, courts state that the *plaintiff* must show that the three-part test has been met. See, e.g., Remick, 238 F.3d at 258 ("the Calder 'effects test' requires the plaintiff to show that . . . ."). However, unlike in Indiana, in the federal system the burden is on the plaintiff to establish personal jurisdiction. See Tamburo v. Dworkin, 601 F.3d 693, 700 (7th Cir. 2010). Thus, for our purposes, in Indiana the burden is on the *defendant* to show that at least one element of the express aiming test is not present.

In determining whether a defendant's conduct satisfies the "express aiming" requirement, we might discern whether such conduct was "intentionally directed at" the forum resident, see Calder, 465 U.S. at 790, or whether "the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." See Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1087 (9th Cir. 2000), overruled on other grounds by Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199, 1207 (9th Cir. 2006) (en banc), cert. denied, 547 U.S. 1163, 126 S. Ct. 2332 (2006).[7] This court has similarly recognized jurisdiction is proper where a defendant exhibits "purposeful conduct" in which "the forum is the focal point of the conduct and the injury . . . ." JP Morgan, 882 N.E.2d at 750 (citing Calder, 465 N.E.2d at 788-789, 104 S. Ct. 1482 (citing World-Wide Volkswagen, 444 U.S at 297-298, 100 S. Ct. 559; and Restatement (Second) of Conflicts of Law § 37)). We examined previous Indiana cases in which a defendant's purposeful conduct subjected it to Indiana's jurisdiction:

> [I]n Brockman v. Kravic, 779 N.E.2d 1250 (Ind. Ct. App. 2002), we held that a psychologist who did not practice and was not licensed in Indiana but sent allegedly defamatory letters regarding his treatment of an Indiana citizen into Indiana that affected the rights of others was subject to Indiana's personal jurisdiction. Similarly, in Mart v. Hess, 703 N.E.2d 190, 193 (Ind. Ct. App. 1998), defendant-wife sent disparaging, libelous, and defamatory letters about the plaintiff-husband from her home in Hawaii to individuals in Indiana. We found that when the claim arises out of the defendant's conduct, "less is required to support jurisdiction," and defendant-wife's acts were sufficient. Id.

---

[7] As observed by the court in Bancroft & Masters, "[e]xpress aiming is a concept that in the jurisdictional context hardly defines itself." 223 F.3d at 1087.

Id.[8]

As stated above, the parties agree that whether Davis's contacts with Indiana are sufficient depends upon our application of the "express aiming test" to the facts. However, before addressing whether the court misapplied the "express aiming test" when it found specific personal jurisdiction, we must examine whether the court clearly erred in making certain factual findings. Davis argues that the Simons "place significant and repeated emphasis on their allegation that Attorney Davis 'called the reporter back and agreed to provide a taped interview at a scheduled date in the future'" and cites to pages 3, 4, 7, 11, 12, 18, and 24 of the Simons' brief. Appellant's Reply Brief at 3. Davis argues that such an allegation "is not supported by the Record on appeal" and notes that the Simons' citation to the record for the proposition consists of Paragraph 44 of Davis's affidavit and to the "Factual Background" section of the court's order, which in turn cites to the same Paragraph 44. Id. at 3-4. Davis further notes that the court's order denying his motion to dismiss made findings to the same effect, and he argues that such findings are erroneous because the court's evidentiary support was the same Paragraph 44 of Davis's affidavit which does not stand for the proposition. Id. at 4. However, we also note that, at oral argument, Davis conceded that "[t]he record . . . does not affirmatively state one way or the other. The inference to be drawn from the way Mr. Davis presented his testimony is that he returned the call, and we have accepted that one inference in the

---

[8] We note that the court in JP Morgan stated that Brockman and Mart "applied Calder;" however, although these cases applied Calder's principles in reaching their decisions, they did not examine the Calder decision itself and focused their analysis on the traditional minimum contacts factors. 882 N.E.2d at 750; see Mart, 703 N.E.2d at 193 ("While it is true that such contacts would not ordinarily subject a nonresident to jurisdiction in our state, the law is clear that an ordinarily insignificant contact with a state becomes constitutionally significant when it gives rise to the claim involved in the lawsuit."); see also Brockman, 779 N.E.2d at 1257-1258 (comparing Mart with certain Indiana cases in which the minimum contacts present were deemed insufficient).

record," before noting that "much has been made about the returning of the phone call, as if somehow that changes who initiated the contacts," that this "is not the inquiry we should be focusing on," and that instead: "While a news source may know that his statements will ultimately end up in the forum state, the news source is not the one selecting the . . . forum state as a target. Instead the news media, the person responsible for publishing the story, has already selected that target."

> The court's order states the following in its "Factual Background:"
>
> The Simons' complaint for defamation and false light publicity stems from one interview which Davis provided to Indianapolis television station WTHR regarding a lawsuit Davis filed in California on behalf of a client. (Complaint ¶ 10-12). WTHR contacted Davis about the lawsuit he filed on behalf of Beverly Du Jacques and Davis responded to the inquiry by WTHR and agreed to schedule a time to provide a taped interview. (Davis Affidavit ¶ 44). Davis *responded* to WTHR's request for an interview and *reached out to Indiana* by giving an interview to an Indiana television station making statements which the Plaintiffs . . . alleged are defamatory.

Appellant's Appendix at 8 (emphasis added). In determining that Davis had sufficient minimum contacts with Indiana, the court relied heavily on its factual finding that Davis responded to WTHR's request and in so doing reached out to Indiana, as follows:

> In this case, an analysis of the aforementioned factors establishes Davis does have the "minimum contacts" sufficient to support specific jurisdiction. With respect to the first factor, Davis acknowledges that the claim brought by the Simons does arise from his alleged "forum contacts" in the form of his scheduled taped interview with WTHR regarding the Du Jacques lawsuit filed in California. Since this defamation case addresses alleged contacts and statements made by Davis to an Indianapolis television station, the Court gives little weight to the second factor, which examines a defendant's overall contacts with the forum state particularly since the Simons are only seeking specific jurisdiction. The third factor is the foreseeability of the defendant being haled into court in Indiana. In this case, it was and is foreseeable that one who makes alleged defamatory statements about an individual where they reside could be haled into Court because the statements were broadcast in the jurisdiction where the plaintiff resides, in this case in Indiana. Although WTHR contacted Davis, he did

13

make a voluntary decision to respond to their inquiry and scheduled a time to provide a taped interview about the Simons. By responding and scheduling a taped interview with WTHR, Davis purposefully established contact with the State of Indiana. Davis "expressly aimed" his comments at Indiana. Where an out-of-state resident such as Davis, an attorney, voluntarily gives an interview to a news organization headquartered in the Plaintiff's hometown, he must "reasonably anticipate being hailed [sic] into court here" [sic] to answer for the truth of those statements. *See Calder v. Jones*, 465 U.S. at 790. Davis's statements did not randomly end up in the possession of an Indiana news source; he directed them solely to that news source. Davis should have foreseen that his statements and comments in the taped interview he provided to WTHR would be broadcast in Indiana and could or would cause harm in Indiana not California. The Court does not find such actions to be random, fortuitous, or attenuated. Such actions are purposeful and make it foreseeable that he could be haled into an Indiana Court.

The fourth question is who initiated the contacts. When examining this prong of the minimum contacts test, the Court finds the initial inquiry was made by WTHR to Davis about the Simons *but that Davis made a voluntary decision to contact WTHR*. He could have simply failed to contact WTHR but he did not. Thus, *he did initiate contact with WTHR when he telephoned them to respond to their inquiry and when he scheduled a time to complete a telephone taped interview*. This is initiating contact. He did not simply answer the telephone and refuse to provide a taped interview. The final "minimum contacts" factor is whether the defendant expected or encouraged contacts with the state. There is nothing present in this case to lead the Court to believe that Davis expected or encourage [sic] contact with the State of Indiana when he filed the lawsuits against the Simons in California but that all changed when he made the *voluntary decision to respond to WTHR's inquiry and schedule a taped interview* and provided that taped interview to an Indianapolis television station. He went beyond simply filing lawsuits on behalf of his clients in the State of California against the Simons, and he purposefully reached out and contacted Indiana when he communicated by his choice with WTHR. When the Court considers the five factors set out in *Anthem*, the Court finds after conducting a Federal Due Process analysis that Davis does have the "minimum contacts" sufficient to support specific jurisdiction under the set of facts present in this case.

Id. at 15-16 (emphases added).

As noted above, there are two paragraphs from Davis's affidavit which are relevant to Davis's contacts with Indiana:

14

43. Prior to March 13, I was initially contacted by a reporter with WTHR in connection with the *Young Case*. The reporter informed me that WTHR had learned of the existence of the *Young Case* through a report distributed by TMZ. The reporter requested that I provide to it (WTHR) a copy of the Complaint in the *Young Case* but I declined and continue to decline to do so. Thereafter, WTHR requested that I provide to it (WTHR) a copy of the Complaint in the *Acosta Case* and *Du Jacques Case* and again, I declined and continue to decline to do so. Thereafter, WTHR notified me that it (WTHR) had obtained copies of the Complaints in the above cases by independent means.

44. In or about April 2010, I was in California when WTHR contacted me by telephone indicating that it was prepared to take my recorded statement regarding Du Jacques, who is suing the Simons for wrongful termination. I was always in California when I spoke by telephone to WTHR. In the recorded statement, I repeatedly referred to the content of the Complaint in the *Du Jacques Case* and that it was Du Jacques (not me) making allegations as referenced in the Complaint, a public record accessible to anyone located anywhere in the world. WTHR did not provide any control to me nor did I have any control over how my comments were edited or how they were presented by WTHR in the context of its reporting. Nor was I provided an advance copy of anything that WTHR published or reported in advance of it doing so.

Id. at 76-77. Based upon the record, the extent of Davis's contacts with the State of Indiana consist of: (1) WTHR phoning Davis multiple times about Davis's various cases against the Simons and requesting that Davis provide WTHR with the complaints filed in those actions, and in each instance Davis declined to so provide the complaint; and (2) WTHR phoning Davis indicating that it "was prepared to take [his] recorded statement," which Davis provided to WTHR. Although we recognize that Davis conceded at oral argument that one inference to be drawn from the record may indicate that he returned a

15

phone call to WTHR, we find the trial court's heavy reliance on this inference in its order to be problematic.[9]

Indeed, regardless of whether Davis returned the WTHR reporter's phone call or not, we conclude that this inquiry is immaterial because the record unequivocally demonstrates that it was WTHR who initiated the contact, and Davis did *nothing more* than simply respond to WTHR's inquiry it initiated. Unlike the defendants in Brockman and Mart, who sent letters into Indiana, Davis's act of responding to the questions of a reporter who initiated the contact with Davis regarding a California lawsuit, in which he is serving as a plaintiff's attorney, was not done with the purpose of expressly targeting a resident of the forum state. Unlike in Calder itself, here Davis neither wrote nor disseminated the news story which is the object of the Simons' defamation and false light claim. In short, the record does not reveal "purposeful conduct" which was "intentionally

_____

[9] We note that, in an attempt to further this argument, the Simons appear to misstate Davis's statements from his affidavit in their Opposition to Davis's Motion to Dismiss, inferring that a time to take Davis's recorded statement had been set up during a previous phone call pursuant to Paragraph 43, stating:

> Davis's suggestion that he did not initiate contact with WTHR means only that WTHR placed the call in which he gave the interview, not the other way around. *But Davis's affidavit says that WTHR "initially" contacted him "[p]rior to March 13" and then in April 2010 told him they were "prepared to take [his] recorded statement." (Davis Aff. ¶¶43, 44). So it appears that WTHR had contacted him earlier to arrange the interview.* So who placed the call at the pre-arranged time is of no consequence. What is important is that Davis knowingly and voluntarily directed defamatory statements to Indiana with the understanding and intention that they would be published here. . . .

Id. at 170 (emphasis added). As discussed above, Paragraph 43 discusses inquiries made by WTHR to Davis asking that Davis send WTHR copies of complaints filed in the Young, Acosta, and Du Jacques cases.

We also note that the Simons assert in their brief that they "requested discovery from Davis before responding to his Motion to Dismiss," that "Davis refused," and that they therefore "pieced together the evidence establishing personal jurisdiction by other means . . . ." Appellees' Brief at 2. Davis responded to the Simons' assertion by noting that "discovery from WTHR related to its contacts with Attorney Davis was a possibility," that "[i]t is [the Simons] who thereafter intentionally chose not to seek discovery from WTHR," and that if true "[t]hat 'only a partial picture of the facts' exists," it "is directly attributable to [the Simons'] own choices." Appellant's Reply Brief at 5.

16

directed at" Indiana on the part of Davis to defame the Simons in Indiana, and accordingly Davis did not "expressly aim" conduct at the State of Indiana.[10]

The contacts present in this case are not unlike those from a case in another court examining personal jurisdiction in a defamation action. In Ticketmaster-New York, Inc. v. Alioto, the Boston Globe, a newspaper, undertook "an investigation into pricing practices on Ticketmaster's part," and "[i]n conducting this investigation, a *Globe* reporter conversed by telephone" with Alioto, who was an attorney practicing in California who was "pressing a class action in the California courts against Ticketmaster . . . ." 26 F.3d 201, 203 (1st Cir. 1994). The newspaper ran a story which stated the following, quoting Alioto: "[K]ickbacks are the key to Ticketmaster's California monopoly. 'They're nothing more than a straight bribe,' [Alioto] said." Id. at 204. The record in that case did "not suggest[] that Alioto dialed the telephone or otherwise initiated the call," and it was "equally barren of any showing that Alioto solicited the inquiry or that more than one call occurred." Id. at 203 (footnote omitted). However, it was clear that Alioto "knew when speaking that his comments would inform a story

---

[10] We note that the crux of the dissent's position is that "[w]here else, *but in Indiana*, could the defamatory remarks have been aimed?" *Infra*, slip op. at __. However, this position presupposes that Davis's conduct was "expressly aimed" at all. Indeed, as explained above "express aiming," although a phrase which "hardly defines itself" in the jurisdictional context, is a term of art and requires a showing that a defendant undertook "purposeful conduct" which was "intentionally directed at" the forum state, and in which "the forum is the focal point of the conduct and the injury." Here, Davis's act of responding to the inquiry of a WTHR reporter by telephone from his office in California about a California lawsuit (rather than "purposefully communicat[ing] with WTHR" and "prompt[ing] WTHR to publish a story," as the Simons alleged in their complaint) did not satisfy Calder's "express aiming" requirement.

Also, we note that the dissent distinguishes Ticketmaster, discussed below, by noting that it does not apply Calder to the issue, and the dissent instead examines this court's opinion in Brockman, concluding that "I am unable to draw a meaningful distinction between *Brockman* and the case now before us." *Infra*, slip op. at __. However, Brockman, which was decided almost twenty years after Calder, did not apply the "express aiming" test or otherwise examine Calder. See generally Brockman, 779 N.E.2d 1250 (holding that certain minimum contacts were present which provided for specific personal jurisdiction).

17

slated for publication in a newspaper circulated chiefly in Massachusetts." Id. at 203-204.

In affirming the district court's dismissal of the action based upon a lack of personal jurisdiction, the court examined the relatedness of the contacts and noted:

> [W]hen the defendant in a defamation action is a journalist's source, the link between the defendant's conduct and the cause of action is attenuated by the intervening activities of third parties, *e.g.*, the reporter, the editor, the media outlet, and that those intermediaries shape, amplify, and occasionally distort the original utterance. This case illustrates the point. The original comment, technically a tort in its own right (if defamatory), inflicted no significant injury, except insofar as it led to republication in the ensuing newspaper article—and the form and tone of the republication was not by any stretch of the most active imagination within the defendant's effective control.

Id. at 207. Further, regarding purposeful availment, the court noted:

> Courts are consentient that when, as in McBreen[ v. Beech Aircraft Corp., 543 F.2d 26 (7th Cir. 1976)], the source of an allegedly defamatory remark *did not initiate the pivotal contact*, and the in-forum injury is not reasonably foreseeable, jurisdiction may not be asserted over the source based on the comment. See, e.g., Madara v. Hall, 916 F.2d 1510, 1517-19 (11th Cir. 1990); Mann v. Tom James Co., 802 F. Supp. 1293, 1296-97 (E.D. Pa. 1992). However, when the source takes the initiative and causes foreseeable injury, jurisdiction may lie. See, e.g., Brown v. Flowers Indus., Inc., 688 F.2d 328, 333-34 (5th Cir. 1982)[, reh'g denied, cert. denied, 460 U.S. 1023, 103 S. Ct. 1275 (1983)]; Rusack v. Harsha, 470 F. Supp. 285, 291 (M.D. Pa. 1978); Fallang v. Hickey, 40 Ohio St. 3d 106, 532 N.E.2d 117, 118-19 (1988) . . . .

Id. at 208 (emphasis added). The court, after first observing that "[t]his case falls between the stools, for, although the source did not initiate the contact, the resultant in-forum injury was foreseeable," held that Ticketmaster "has made only the most marginal of showings that Alioto purposefully availed himself of an opportunity to act in Massachusetts." Id. at 208-209. The court explained its holding using the "classic analogy for an out-of-state libel: the gunman firing across a state line," as follows:

18

In a situation like this one, the analogy is imperfect. The person who responds to a journalist's question in the course of an interview initiated by the latter is less like a traditional sniper and more like a person who has been transported to the border and eased into position behind a rifle aimed at a pre-selected target. *While such a person retains the choice of pulling the trigger, or not, he cannot fairly be equated with an individual who has achieved the same position through a series of personalized affirmative choices reaffirmed at every significant juncture*.

Id. (emphasis added).

Thus, although the court did not explicitly apply the "express aiming test," we find the Ticketmaster court's analysis instructive in answering the question of whether an attorney, answering a reporter's unsolicited questions, in which the attorney made comments regarding the allegations of a lawsuit and represented that the allegations were truthful, without more, constitutes expressly aiming one's conduct at the forum state. We conclude that it does not.[11]

Finally, the Simons cite to the recent United States Supreme Court case of J. McIntyre Mach., Ltd. V. Nicastro, 131 S. Ct. 2780, 2787 (2011), for the proposition that

---

[11] Davis also directs our attention to a treatise in support of his position which states:

[W]here a plaintiff is allegedly defamed by statements made by an out-of-state news source during a telephone conversation instituted by a forum reporter, and where the statement is subsequently published in the forum state, the courts of that state do not, in most cases, on that basis alone, have jurisdiction over the source in a resulting libel suit. The source's act in responding to a question by telephone is not sufficiently directed to the state to confer jurisdiction there. The result is particularly appropriate where the plaintiff, too, is from out of state, but the result should be the same in any event.

When a forum seeks to establish specific personal jurisdiction over a nonresident defendant, due process requires that there be fair warning that a particular activity may subject him to personal jurisdiction in that forum. This fair warning requirement is satisfied if the defendant purposefully directed his activities toward the forum state. Defendants rightly argue that it would be senseless to find that their answering the telephone [one in Iowa and one in Indiana] and speaking to a Dallas reporter constituted "purposeful direction."

ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER & RELATED PROBLEMS § 15:1.3 (4th Ed. 2011) (footnotes omitted).

19

Davis is "attempting to avoid Indiana's jurisdiction" and "trying to obstruct Indiana's laws by forcing [the Simons] to bring their claims in a forum state that he believes (correctly) would treat his defamation more leniently." Appellees' Brief at 25. As cited to by the Simons, the J. McIntyre Court, in a plurality decision, noted:

> As a general rule, the sovereign's exercise of power requires some act by which the defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Hanson*, 357 U.S., at 253, though *in some cases, as with an intentional tort, the defendant might well fall within the State's authority by reason of his attempt to obstruct its laws*.

Id. (quoting J. McIntyre, 131 S. Ct. at 2787).

However, we note that this issue has been previously addressed since the Court's opinion in J. McIntyre. In S.E.C. v. Compania Internacional Financiera S.A., No. 11 Civ. 4904(DLC), 2011 WL 3251813 (S.D.N.Y. July 29, 2011), "[t]he SEC allege[d] that the defendants traded Arch securities using insider information in violation of § 10(b) of the Securities Exchange Act of 1934 . . . ." Id. at *4. The court, in examining whether it had personal jurisdiction over the defendants, examined the relevant language from J. McIntyre and noted:

> This is not a new statement of the law, as the Second Circuit had earlier held that "personal jurisdiction is proper where the defendant took 'intentional, and allegedly tortious, actions expressly aimed at the forum.'" In re Terrorist Attacks on September 11, 2001, 538 F.3d 71, 93 (2d Cir. 2008) (quoting Calder v. Jones, 465 U.S. 783, 789, (1984))."

Id. at *5. We agree with the Compania Internacional Financieara S.A. court that this is not a new statement of the law and is instead a statement grounded in the "express aiming test."[12]

---

[12] Indeed, were we to conclude that this statement *is* a new statement of law, it would abrogate the

20

For the foregoing reasons, we reverse the court's order denying Davis's Motion to Dismiss.

Reversed.

BAKER, J., concurs.

KIRSCH, J., dissents with separate opinion.

---

"express aiming test," which includes the commission of an intentional tort as one of the three elements to satisfy in its application.

# IN THE
# COURT OF APPEALS OF INDIANA

JOSEPH A. DAVIS,                        )
                                        )
    Appellant-Defendant,            )
                                        )
        vs.                     )    No. 49A04-1101-CT-5
                                        )
HERBERT SIMON AND BUI SIMON,            )
                                        )
    Appellee-Plaintiff.             )

**KIRSCH, Judge,** *dissenting***.**

I respectfully dissent.

In *Calder v. Jones,* 465 U.S. 783, 789 (1984), the United States Supreme Court addressed the issue of long arm jurisdiction. In *Calder,* the plaintiff, a known entertainer, sued the defendant, a national magazine, in California for libel published in Florida and circulated in California. *Id.* at 785. Prior to publishing the allegedly libelous article, the defendant's reporter lived in Florida, did the majority of his research in Florida, made phone calls and wrote letters from Florida to California, and occasionally flew to California on business. *Id.* at 785–86. The named defendant, Calder, was the president and editor of the magazine and had been to California once prior to the publication, for pleasure not business. *Id.* The

22

Court agreed with the California Court of Appeal and its holding that defendant's contacts were insufficient to establish general jurisdiction, but that specific jurisdiction exists when the action arises out of the defendant's "intentional conduct" allegedly calculated to cause injury in the forum state. *Id.* at 791. Where the forum is the focal point of the conduct and the injury, jurisdiction is proper. *Id.* at 790 (citing *World-Wide Volkswagen Corp. et al. v. Woodson,* 444 U.S 286, 297–98 and Restatement (Second) of Conflicts of Law § 37) (known as the "effects" test). The court held that specific jurisdiction lay in the forum state because the defendant's intentional and allegedly tortious actions were "expressly aimed" at the forum state. *Id*. at 789.

In *JPMorgan Chase Bank, N.A. v. Desert Palace, Inc.,* 882 N.E.2d 743 (Ind. Ct. App. 2008), we applied *Calder* and said that jurisdiction is proper where the forum is the focal point of the defendant's purposeful conduct and the plaintiff's injury.

Here, California Attorney Joseph Davis returned a long distance telephone call from a television reporter located in Indianapolis, Indiana. The reporter identified himself as a reporter for WTHR, an Indianapolis television station. Davis agreed to provide a taped interview to the reporter. In due course, Davis provided the taped interview to the reporter by long distance telephone call to the reporter in Indiana. In the course of the interview, Davis made remarks that are

23

deemed to be defamatory at this stage of the litigation. These defamatory remarks were broadcast by the television station throughout central Indiana.

By intentionally communicating defamatory statements about Herbert and Bui Simon to a reporter for an Indianapolis television station, Joseph Davis engaged in intentional conduct *in Indiana* that was calculated to cause injury to the Simons *in Indiana*. *Indiana* was the focal point of the defendant's purposeful conduct and the plaintiffs' injuries. Davis's conduct was "expressly aimed" *at Indiana*. His intention was to cause harm to the Simons *in Indiana*. The reporter worked *only in Indiana*, and WTHR broadcasts *only in Indiana*. Where else, *but in Indiana*, could the defamatory remarks have been aimed?

Indeed, Davis's tortious conduct here was more directly and narrowly aimed at Indiana than the conduct at issue before the Court in *Calder*. In *Calder,* the defamatory statements were written and published in a magazine issue in the foreign state, which was then distributed nationally, including California, the plaintiff's state of residence. Here, Davis's defamatory statements were not transmitted nationally, but were telephonically transmitted only to Indiana where it was clearly foreseeable that they would be re-transmitted throughout the state.

My colleagues rely upon the decision of the federal Circuit Court of Appeal's decision in *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201 (1st Cir. 1994). While the facts presented by the case are analogous, I do not believe that the court's opinion in *Ticketmaster* should inform our decision here. Although

24

*Ticketmaster* was decided more than ten years after the United States Supreme Court decided *Calder*, the court in *Ticketmaster* did not apply, and did not discuss, the express aiming test set forth in *Calder* and, indeed, cited the *Calder* decision only in relation to a collateral issue.

In *Brockman v. Kravic*, 779 N.E.2d 1250 (Ind. Ct. App. 2002), we held that a psychologist who was not licensed and did not practice in Indiana, but sent allegedly defamatory letters into Indiana about an Indiana resident was subject to specific personal jurisdiction in Indiana. Indiana was where the alleged wrong was committed and where the alleged harm to the plaintiff occurred. The defendant's tortious actions were expressly aimed at Indiana.

Here, a lawyer who was not licensed in and did not practice in Indiana communicated allegedly defamatory statements to an Indiana television station via telephone about a long-time Indiana resident who maintains a significant presence in this state. The defendant's tortious actions were expressly aimed at Indiana. Indiana was where the alleged wrong was committed and where the alleged harm occurred. I am unable to draw a meaningful distinction between *Brockman* and the case now before us.

More than fifty years ago, the United State Supreme Court observed that a state has "a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *McGee v. Int'l Life Ins.*

25

*Co.*, 355 U.S. 220, 223 (1957). Indiana's interest here is similarly manifest. I would affirm the considered judgment of the trial court in all particulars.